SPRAGUE-DAWLEY, INC., Appellant, V. MOORE and another, Respondents.

*January 5—January 30, 1968.*

---

[1] The defendant, Dupons Construction Company, Inc., has not appeared in this appeal.

690

691

692

For the appellant there were briefs by *Ross, Stevens, Pick & Spohn,* attorneys, and *Thomas D. Zilavy* and *Richard C. Glesner* of counsel, all of Madison, and oral argument by *Mr. Zilavy.*

For the respondent Industrial Commission there was a brief by *Arnold J. Spencer,* chief counsel of the unemployment compensation division, and *Max J. Peltin* of Madison, and oral argument by *Mr. Peltin.*

HEFFERNAN, J.   Sprague-Dawley bases its contention primarily upon the words of the pertinent statutory provisions. The statute, sec. 108.02 (5) (g) 1, Stats., exempts employment in "agricultural labor," which is defined in sec. 108.02 (23) (a) and (e) as services performed:

"(a) On a farm, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training and management of live stock, bees, poultry, and fur-bearing animals and wildlife."

"(e) As used in this subsection, the term 'farm' includes stock, dairy, poultry, fruit, fur-bearing animal, and truck farms, plantations, ranches, nurseries, ranges,

greenhouses or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards."

The argument of Sprague-Dawley, when reduced to its essentials, is merely that the albino rat is a "fur-bearing animal" or is a kind of "wildlife." In the event the Sprague-Dawley rats fit either of these categories, labor performed in connection with their culture is labor on a "farm" as defined in the Act and, hence, the services are not covered by the Unemployment Compensation Act. The problem presented is one of statutory construction and, therefore, is a matter of law to be decided by this court without giving any special weight to the conclusions of the Industrial Commission. *Marathon Electric Mfg. Corp. v. Industrial Comm.* (1955), 269 Wis. 394, 404, 69 N. W. 2d 573, 70 N. W. 2d 576. While much space in appellant's brief is devoted to the thesis that a white rat is a "fur-bearing animal," this position was substantially abandoned at oral argument.

A "furbearer" is defined in Webster's Third New International Dictionary as "An animal that bears fur esp. of a commercially desired quality." "Fur" is defined, in part, as "A piece of the dressed pelt of an animal (as ermine, rabbit, seal) used as a material to make, trim, or line wearing apparel or other articles . . . an article of clothing made of fur . . . ." A "fur breeder" is defined as "one that breeds fur-bearing animals esp. for commercial purposes."

A recent decision of the United States District Court for the Northern District of Georgia, although not precedent for this court, is persuasive in its reasoning. Therein it was claimed by the Southern Rabbit Corporation that rabbits raised for experimental purposes were exempt from the provisions of the Fair Labor Standards Act. 29 U. S. C. A. 203 (f) exempted "the raising of livestock, bees, fur-bearing animals, or poul-

try." The court adopted the administrative standard defined in 29 C. F. R. sec. 780.133 (1961) providing that "(a) The term 'fur-bearing animals' has reference to animals which bear fur of marketable value . . . ."

The court stated:

"The clear intent of the agricultural exemption is to exempt agricultural or farm activities. The non-farm commercial activity of buying animals (rabbits or others) from farmers and other 'independent contractors', caring for and feeding most of them until they meet buyers' specifications, and then selling them as experimental animals, as is the case here, does not constitute the raising of fur-bearing animals, and is not exempt as 'agriculture'. The fact that rabbits raised solely for experimental purposes by this defendant may also be raised by others as fur-bearing animals is not a valid basis for exempting this defendant." [1]

It is conceded that the rats raised by Sprague-Dawley have no value for their pelts. We conclude that white rats raised for experimental purposes are not "fur-bearing animals" within the meaning of the statute.

### Are albino rats raised for experimental purposes "wildlife"

The commission also concluded that albino rats are not "wildlife" under sec. 108.02 (23), Stats., because:

". . . they do not exist in a state of nature, do not inhabit natural haunts, are not of a kind not ordinarily subjected to domestication, and are not produced without the aid and care of man. On the contrary, albino rats have been developed by man through selective breeding."

[1] *Beck v. Southern Rabbit Corp.* (D. C. Ga. 1966), 248 Fed. Supp. 1005, 1007, 1008. *See also Mitchell v. Maxfield* (D. C. S. D. Ohio, 1956), 29 Labor Cases 1955–1956, par. 69,781, holding that mice, rats or guinea pigs were not "fur-bearing animals" under the Fair Labor Standards Act.

Webster's Third New International Dictionary defines wildlife as:

"Living things that are neither human nor domesticated; *esp:* the mammals, birds, and fishes that are hunted by man for sport or food."

Sec. 29.01 (1), Stats., contains the following definition of wild animal:

"WILD ANIMAL. 'Wild animal' means any mammal, bird, fish, or other creature of a wild nature endowed with sensation and the power of voluntary motion."

The Internal Revenue Service, Em. T. 437, C. B. 1942–2, pages 208, 209, takes the position that, for purposes of the F. U. T. A., wildlife includes:

"All animals belonging to a species or class generally considered wild regardless of the element or elements which they inhabit."

The above definitions and interpretations amply support the commission's conclusion that white albino rats are not "wildlife." The term implies nondomestication and outdoor habitation (even though confined). *Seley v. Unemployment Compensation Board of Review* (1958), 185 Pa. Super. 413, 138 Atl. 2d 174, concludes that pheasants are wildlife. Sprague-Dawley's breed of albino rats is developed in a controlled environment under precise laboratory conditions. As Henry H. Donaldson, the author of *The Rat* and a leading authority on the subject, notes in his treatise:

"The common wild rats in the United States usually live in close association with man. There are two species of these, both of which have been introduced from Europe. These are Mus rattus . . . together with its gray form, Mus alexandrinus . . . and Mus norvegicus . . . . This last species is our common gray, brown or Norway rat. In addition to these, all of which are wild, there is a fourth form—the albino rat . . . a variety of

Mus norvegicus . . . which is known at present only as a domesticated strain . . . ." (p. 7.)

"We do not know whether the common albino variety had a single or multiple origin, or whether the colonies found in Europe . . . are directly related to those now existing here. . . . Judging from the way in which the Albinos of other species arise, we may safely assume that the present strain is derived from one or more albino mutants or sports . . . . These must have been captured and the albino descendants segregated and kept as pets, as at present there is nowhere to be found an established colony of Albinos living in open competition with the common Norways or with forms of Mus rattus, but all of the colonies are maintained practically under conditions of domestication." (pp. 11, 12.)

It is apparent, therefore, that the Sprague-Dawley rats are not wildlife. They do not, and on good authority cannot, survive in a state of nature. They have been developed by man only on the basis of selective breeding and would not exist, except as an occasional sport, without careful human control and genetic management. The albino rat as mass produced by Sprague-Dawley is a domestic animal, the product of man's dominion over nature.

*Effect of I. R. S. District Director's ruling that Sprague-Dawley is exempt under F. U. T. A.*

The appellant urges that we adopt the ruling of the director of the Wisconsin district of the Internal Revenue Service that the Sprague-Dawley operation is "agricultural labor" and, hence, exempt from the payment of the Federal Unemployment Compensation Tax.

While the determination by the administrator of a federal program is entitled to weight in construing the meaning of a substantially similar provision of the state law involving the same subject matter, it is not conclusive on the subject. *Industrial Comm. v. Woodlawn Cemetery Asso.* (1939), 232 Wis. 527, 533, 287 N. W. 750. More-

over, the authority cited by the appellant is weak indeed, for the one or two instances relied upon are not sufficient to show a general application that has proved acceptable to the Internal Revenue Service as a whole, and which has gained stature through frequent administrative practice or practical construction of the statute. We are persuaded that the interpretation urged, as applied to our statute at least, is clearly erroneous. We are directed by sec. 108.02 (21), Stats., to interpret undefined terms "in accordance with the common and approved usage thereof . . . ." As so viewed, the Sprague-Dawley rats are neither "fur-bearing" nor "wildlife." Under the terms of the Wisconsin Unemployment Compensation Act, employment in an enterprise breeding, raising, and selling them is not agricultural labor.

*By the Court.*—Judgment affirmed.