ENGINEERS & SCIENTISTS OF MILWAUKEE, INC., Appellant, v. CITY OF MILWAUKEE, Respondent.

*February 29—April 9, 1968.*

For the appellant there were briefs by *Kaumheimer, Reinhart, Boerner, Van Deuren & Norris,* attorneys, and *Paul V. Lucke* of counsel, all of Milwaukee, and oral argument by *Mr. Lucke.*

For the respondent there was a brief by *John J. Fleming*, city attorney, and *Maurice L. Markey*, assistant city attorney, and oral argument by *Mr. Markey*.

HEFFERNAN, J. One who seeks to have his property exempt from taxation is required to bring himself within the terms of the exemption statute. This court has frequently stated that taxation is the rule and that exemption from taxation is the exception. In *Bethel Convalescent Home v. Richfield* (1961), 15 Wis. 2d 1, 4, 111 N. W. 2d 913, we quoted with approval the rule stated in *Madison Aerie No. 623 F. O. E. v. Madison* (1957), 275 Wis. 472, 476, 82 N. W. 2d 207:

" 'Statutes exempting property from taxation are to be strictly construed and all doubts are resolved in favor of its taxability. To be entitled to tax exemption the taxpayer must bring himself within the exact terms of the exemption statute.' "

In the recent case of *Columbia Hospital Asso. v. Milwaukee* (1967), 35 Wis. 2d 660, 668, 669, 151 N. W. 2d 750, we pointed out that:

". . . a strict construction is nonetheless a construction, and an exemption statute need not be given an unreasonable construction or the narrowest possible construction. A 'strict but reasonable' construction seems to be the pithy and popular statement of the rule. [Citing cases] The difference between a liberal and a strict construction is best illustrated in those cases where the meaning of the language expressing the objective intent of the legislature is doubtful; in such cases, any doubt under the strict construction rule must be resolved against the exemption. Thus an exemption should be expressed in such clear language as to leave no doubt."

In the instant case, the findings of fact of the trial judge, other than the ultimate finding that ESM is a scientific and not an educational association, are substantially undisputed. In view of the fact that the

evidentiary findings of fact made by the trial judge are conceded to be correct, this appeal does not pose the question of whether those facts are contrary to the great weight and clear preponderance of the evidence. Nor do we deem that such test is applicable to what the trial judge denominated as the ultimate conclusions of fact, for that conclusion is dependent upon the trial judge's construction of the term, "educational association," and as we stated in *Sprague-Dawley, Inc., v. Moore* (1968), 37 Wis. 2d 689, 693, 155 N. W. 2d 579, "The problem presented is one of statutory construction and, therefore, is a matter of law to be decided by this court without giving any special weight to the conclusions . . ." of the trial court.

Thus, we must look to the facts *ab initio* to determine whether the primary use to which the building is put comes within the compass of what the legislature has denominated as an educational association. The facts are these:

ESM was organized in 1904 [1] and presently owns a three-story building in the city of Milwaukee. The building has been remodeled for class and meeting rooms and, in addition, contains a kitchen and dining rooms, offices, and a public library housing 2,000 to 3,000 volumes of engineering texts and materials. No meals are prepared at ESM, and there are no recreational facilities, although catering services are sporadically used. ESM has seven persons in its employ: An executive secretary, an editor for its publication, *Milwaukee Engineering,* three secretaries, one custodian, and a part-time cleaning lady.

Membership in ESM totals approximately 1,700 and is open to graduate or registered engineers, technicians, or anyone working in the general field of engineering and science. Annual dues are $25 for members over thirty

[1] Originally, the organization was called the Engineers' Society of Milwaukee. In 1963, it was renamed Engineers & Scientists of Milwaukee, Inc.

and $17.50 for those not having attained that age. In addition, members living in excess of 50 miles from Milwaukee pay an annual fee of $7.50, and student membership costs $5.

The activities conducted at the ESM facilities are of a diverse nature. Of prime importance are meetings held by national engineering and technical groups not having facilities in the Milwaukee area. Approximately 20 of these groups use the ESM facilities for meetings, the purpose of which is to educate engineers and technicians on current developments, trends, and practices in their respective fields. In 1964, of the 441 meetings held at ESM, 257 were conducted by non-ESM groups. These groups generally pay a $12 room-rental fee for each meeting, the fee based entirely on maintenance costs.

Structurally, ESM is presently divided in 10 divisions,[2] although during 1964, there were only six or seven. Each division is required to schedule five annual meetings with a guest speaker and one annual seminar.

The meetings of the ESM divisions are normally dinner affairs, followed by lectures or classes. Attendance is not restricted to ESM members, although nonmembers normally pay a slightly higher dinner fee. Approximately 3,000 fliers are mailed prior to each meeting; 1,700 are sent to ESM members and the remainder to companies, plants, newspapers, TV and radio stations, various engineering and technical schools throughout the state, and to the 700–800 members of the Wisconsin chapter of the Society of Civil Engineers.

Other activities at ESM include a speech class taught by a professor from Marquette University, a toastmaster's club, which meets bimonthly at ESM and is open to the public, and explorer scout post meetings for sons of both members and nonmembers.

---

[2] Construction, management, materials, sales engineering, motors and controls, manufacturing, science research, technical education, machine design, and civic affairs.

In addition, ESM, in cooperation with the University of Wisconsin, sponsored four two-day institutes taught by U. W. faculty for the purpose of refreshing individuals for professional engineering examinations; 6,500 fliers were sent to Milwaukee area engineers.

ESM's vocational-guidance standing committee provided speakers for Career Days at various Milwaukee high schools and also sponsored a meeting for high school vocational-guidance counselors. The ESM building is also used by college representatives to present their curriculum to interested high school students. During 1964, seven separate panels were conducted.

ESM's scholarship committee held a benefit concert to aid 17 students taking engineering and science courses at various colleges. Each student was provided $300 per year for four years.

During 1964, ESM held three dinner dances. These affairs were restricted to members and were entirely social in nature.

*Milwaukee Engineering,* the ESM magazine, was published 11 times during 1964. Subscriptions are $2 per year, and the circulation is about 3,000. The primary purpose of the magazine is to inform interested persons of meetings of technical organizations in the Milwaukee area. It is supported by advertisements by local industrial concerns.

ESM also publishes an annual directory containing listings of engineers and scientists in the Milwaukee area and articles on recent developments in the fields of engineering and science. The directory is circulated to ESM members, other subscribers, presidents and engineers of industrial firms, and various schools throughout Wisconsin.

ESM also operates an addressograph service for other technical organizations and educational institutions. For a nominal fee, ESM informs approximately 11,500 engineers and scientists of various meetings in the Milwaukee

area. During 1964, ESM addressed more than 300,000 pieces of mail, of which 100,000 were sent to engineering schools in Wisconsin.

During 1964, the civic affairs committee of ESM met with various governmental agencies and published reports in the *Milwaukee Engineering* relating to various urban problems such as pollution, flood control, and transportation.

ESM also conducts a monthly educational film series with emphasis on films of a scientific nature. These, in addition to various travel and adventure films, are open to the public without any admission fee.

The dean of engineering at Milwaukee School of Engineering and the former dean of engineering at Marquette testified on behalf of ESM. Both these educators, in essence, viewed ESM's program as one of continuing education for Milwaukee engineers and scientists. They acknowledged that engineering is a rapidly changing field requiring continuous refresher courses. It was their opinion that the educational institutions in Wisconsin were not fully capable of providing this service and that ESM played a vital role in the field of continuing education.

ESM operated at a loss during fiscal years 1963 and 1964. Expenses exceeded income by about $15,000 from July 1, 1963, to June 30, 1965. Even had ESM operated at a profit, its articles of incorporation prohibited the issuance of any dividends or profits to the organizers or members. The executive secretary of ESM testified that the purposes of the organization were set forth on the membership-application blank. As set forth therein, the purposes were:

A. Keeping engineers and scientists abreast of latest developments in their fields by means of meetings, seminars, discussion groups, classes, institutes, conferences, inspection trips, and related activities.

B. Promoting engineering and scientific opportunities in eastern Wisconsin through cooperation with other professional societies, civic and educational institutions, and industry.

C. Providing engineers and scientists from all branches of the professions and from different industries with opportunities to meet and exchange ideas in informal gatherings.

This review of the facts indicates that a substantial portion of the activities conducted in the building are vaguely for the purpose of promoting educational objectives for the benefit of engineers and scientists. It is clear, however, that this educational function differs from the usual and traditional concept of an educational association. The testimony of the deans of the engineering school of Marquette and of the Milwaukee School of Engineering are particularly significant in characterizing the overall nature of the work. They characterized the program, for the most part, as being one of "continuing education." However, the continuing education indulged in by ESM is obviously not limited to education in the traditional sense but partakes also of the promotion of the general welfare of the engineering and scientific professions as well as the upgrading of professional competence of individual engineers and scientists. The membership application in section B referred to promoting engineering and scientific opportunities in eastern Wisconsin through cooperation with other professional societies. To this court, it appears that this at least smacks of the exchange of information for improved employment opportunities.

There are numerous activities carried on in the building which do not come directly under the aegis of ESM sponsorship; and even though we were to conclude, and we do not, that the work of ESM itself constitutes that of an educational association, it is also necessary that the other uses of the building, if substantial, must

be of the same nature. *Missionaries of La Salette v. Michalski* (1962), 15 Wis. 2d 593, 113 N. W. 2d 427. It was held in *Cardinal Publishing Co. v. Madison* (1932), 208 Wis. 517, 243 N. W. 325, that where the publishers of the University of Wisconsin student newspaper received more than 10 percent of its gross printing income from sources not considered educational, the exemption was destroyed. In the instant case, some purely social events were conducted; however, if the exemption exists, the fact that three dinner dances were held is so inconsequential a deviation that it would not destroy any existing exemptions. We stated in *Northwestern Publishing House v. Milwaukee* (1922), 177 Wis. 401, 409, 188 N. W. 636, that an insignificant deviation from the exempted purpose would not impair the tax-free status. We cannot agree with respondent that the use made of the building for meetings of the toastmaster's club, effective speaking classes, the explorer's scout post, the series of travel and adventure films, and the family film series destroyed the exemption if one exists. While these activities do not fit within the avowed corporate purpose of ESM, they are more clearly educational than the principal. functions carried out. Nor can we conclude that the respondent correctly contends that ESM lost its tax exemption when renting its property to other organizations. Two hundred fifty seven of the 441 meetings held in the building during 1964 were non-ESM organizations, but they were of scientific and engineering organizations not having a meeting place of their own. If the function of ESM is an exempted function, these activities would be also, for sec. 70.11 (4), Stats., in part provides:

"Leasing such property to similar organizations for educational or benevolent purposes, where all the income derived therefrom is used for maintenance, shall not render the property taxable."

We thus conclude that the overall function of the organization is for the continuing education and the professional advancement of engineers and scientists. The question thus presented is whether education for this purpose, which is, on its face, designed for the advancement not only of education and learning as such, but for the promotion of the engineering and scientific professions, by developing the contacts between its members and in promoting employment opportunities, is a function of an educational association as envisaged by the statutes. We have no doubt that these are socially worthwhile and desirable objectives, and they serve the engineering profession by improving the competence of the members to that profession and thus indirectly contribute to the general welfare.

The trial judge concluded that the organization was not an educational association but was primarily a scientific organization. A brief review of the legislative history makes it clear that scientific associations are no longer included within the exemption. Prior to 1931, sec. 70.11 (4), Stats., exempted "religious, scientific, literary, educational or benevolent associations." By ch. 465, Laws of 1931, there was added the exemption for "educational institution having a regular curriculum and offering courses for at least six months in the year." That same chapter deleted the exemption for educational associations. At that juncture of legislative history it could not have been arguably contended that there was an exemption for any type of educational organization unless it offered regular courses; and it is clear, of course, that ESM does not offer regular courses. However, by ch. 63 of the Laws of 1949, the exemption for "educational associations" was reinstated, and the exemption for scientific and literary associations was deleted. It is thus apparent that it is not necessary that an organization conduct regular classes for a six-month period in order to be exempt as "educational." It is

equally apparent that the legislature intended to exclude scientific associations from the exemption.

ESM partakes of the characteristics of both a scientific organization and of an educational association for the purpose of providing continuing education for engineers and scientists. We thus have a state of ambivalence, wherein the use is, in part, clearly contrary to the legislative intent of providing an exemption and, in part, a use which is arguably exempt.

We thus return to the basic premise of the construction of the tax-exemption statutes that taxation is the rule and exemption is the exception, which must be clearly spelled out by legislative intent. The facts in this case do not meet this test of construction, and we are therefore obliged to hold, although reluctantly, that the primary purpose of ESM is not that of an educational association. We are also dubious, and must therefore conclude in the negative, that it was the legislature's intent to encompass the continuing education of a particular profession within the ambit of the function of an educational association. Although not controlling in this case, since the pertinent legislation was subsequent to the facts which we are considering herein, we point out that ch. 144 of the Laws of 1967 created an additional exemption by sec. 70.11 (25), Stats., which in par. (b) thereof exempted nonprofit medical research foundations which, among other things, were for the purpose of:

". . . providing instruction for practicing physicians and surgeons, promoting education, training, skill and investigative ability of physicians, scientists and individuals engaged in work in the basic sciences which bear on medicine and surgery."

These certainly are educational functions, which would require no special exemption if continuing education were within the legislative contemplation; yet, the legislature found it necessary to frame a new and specific exemption. We base our conclusion, however, not upon

this *post litem* legislation but upon the fact that the appellant has failed to convince us that by strictly, but reasonably, construing the statute, we may be reasonably free of doubt that the activities of ESM were within the legislative intent when it exempted educational associations. While an exemption for activities of this kind might well serve a public purpose, the decision to allow the exemption must clearly be spelled out by the legislature.

*By the Court.*—Judgment and order affirmed.

ROBERT W. HANSEN, J. (*dissenting*). The statute involved (sec. 70.11 (4), Stats.) is clear and unmistakable in language and intent. The legislature has exempted from taxation property owned and used by "educational . . . associations." This is in addition to the tax exemption granted to "educational institutions offering regular courses 6 months in the year." The legislature goes beyond tax exemption for schools, colleges and universities to encourage the growth and development of nongovernmental associations that are educational in their work and purpose.

Is the appellant, an incorporated association of engineers and scientists in Milwaukee, such an educational association? The majority opinion accurately lists its activities: Use of its facilities for meetings, the purpose of which is to educate engineers and technicians on current developments, etc.; lectures and classes; a speech class; institutes for professional engineers; speakers for Career Days at local high schools; vocational-guidance counseling; publication of Milwaukee Engineering magazine; publishing an annual directory with articles on recent developments in the fields of engineering and science; conducting educational films series; publishing reports on urban problems such as pollution, flood control and transportation. If these are not educational activities, what are they? If the association which has them as its reason for being is not an educational associa-

tion, what type of association would be considered educational?

The majority opinion concedes that these are educational activities but finds them to be "continuing education." What else? Pre-diploma education is the function of "educational institutions offering regular courses." Post-diploma education, continuing after the sheepskin is presented is the only field in which "educational associations" have reason for existence. The majority opinion observes that the continuing education here involved "partakes also of the promotion of the general welfare of the engineering and scientific professions as well as the upgrading of professional competence of individual engineers and scientists." What's wrong with that? That could stand as a definition of the purpose of vocational and professional education beyond the undergraduate level. Self-improvement is not outside the educational process. To upgrade professional competence of individuals participating is a legitimate purpose and reason for being of educational associations.

Of course, the engineering society's activities are in the field of continuing education. Education is a lifelong process. It does not end with getting a degree or diploma. Where in the statute does it state that educational associations providing continuing education are outside the exemption granted? The majority opinion reassures itself that it is strictly construing the statute here involved. It does more than that. It amends the statute to exclude educational associations in the field of continuing education. Actually, it may very well have repealed the tax exemption for educational associations, for, if this association is not an educational association, it is difficult to see anywhere in the state a group that could or would be so considered.