## Staunton

### CITY OF RICHMOND v. RICHMOND MEMORIAL HOSPITAL, ET AL.

September 2, 1960.

Record No. 5099.

Present, All the Justices.

The opinion states the case.

*John P. McGuire, Jr., Assistant City Attorney (J. E. Drinard, City Attorney,* on brief), for the appellant.

*Eppa Hunton, IV* and *Lewis F. Powell, Jr. (Harry Fraizer, III; George E. Haw; Hunton, Williams, Gay, Powell & Gibson; Haw & Haw,* on brief), for the appellees.

WHITTLE, J., delivered the opinion of the court.

■ This is an appeal by the City of Richmond from an adverse decision in a consolidated proceeding brought by Richmond Memorial Hospital and Richmond Eye Hospital under §§ 58-1145 to 58-1150, Code of Virginia, 1950, involving the correction of real estate taxes allegedly erroneously assessed.

Involved are applications by Richmond Memorial Hospital for relief from the payment of real estate taxes for the years 1956, 1957 and 1958, totaling $209,611.74, and by Richmond Eye Hospital for relief from payment of real estate taxes for the years 1954 through 1958, totaling $53,653.10. By agreement the cases were consolidated.

Although the city lists six assignments of error the paramount question is whether the hospitals are entitled to tax exemption under Section 183(e) of the Constitution of Virginia. The section reads:

"Unless otherwise provided in this Constitution, the following property and no other shall be exempt from taxation, State and local, including inheritance taxes:

\*     \*     \*     \*     \*     \*     \*

"(e) Real estate belonging to, actually and exclusively occupied and used by, and personal property, including endowment funds,

belonging to Young Men's Christian Associations, and other similar religious associations, orphan or other asylums, reformatories, hospitals and nunneries, conducted not for profit, but exclusively as charities, also parks or playgrounds held by trustees for the perpetual use of the general public."

The record discloses that Richmond Memorial Hospital was organized as a non-profit charitable general hospital. It was a community project, some 33,000 individuals and businesses contributing approximately $4,000,000 in the fund-raising campaign. Additional funds from the State and Federal governments increased the total amount raised to nearly $7,000,000. With these funds a modern 374-bed general hospital was constructed and equipped on a donated site in the City of Richmond. Construction was commenced in 1954 and completed during 1956. The hospital has been caring for patients since January, 1957.

According to its charter, Richmond Memorial is a non-stock, non-profit corporation which, from its inception, has been operated in strict accord with its corporate purposes. None of its officers, trustees or contributors profits from its operation or receives any special consideration.

The Board of Trustees, composed entirely of laymen, has the responsibility for making policy which is carried out under the direction of professional hospital administrators. The doctors are organized separately in a medical staff which has its own chief and makes its own by-laws, rules and regulations, subject to the approval of the Board of Trustees. The medical staff and the Board of Trustees function separately and no doctor serves on the Board of Trustees or the Executive Committee. The Board of Trustees is in complete control. The doctors have nothing to do with the general administration of the hospital. The hospital determines its charges and fees, but exercises no control over the charges made to patients by doctors.

Richmond Memorial has the largest medical staff of any hospital in Richmond, numbering 458 practicing physicians. The hospital is open to all, regardless of race or ability to pay. No patient is turned down because he cannot pay, and all receive the same service whether they pay the full rate or nothing.

Although it was never intended that Richmond Memorial should be a one hundred per cent free hospital, it has been anticipated from the beginning that free care would be provided consistent with the demand and with the hospital's financial ability.

The hospital is operated with the expectation that all patients who are able to pay will pay, which payments constitute virtually the sole source of operating income, within which the hospital must operate. Sustained deficit operations would force it to close. There is no effort to make a "profit" in a conventional sense. Any operating surplus is used for such charitable purposes as keeping the hospital modern and providing more free service. The record further discloses that for the first two years the hospital operated at a substantial loss. The amount of free care rendered during the second year was much greater than during the first.

Richmond Memorial is a public community hospital as illustrated by the broad scope of public services which it renders. It has laboratories and an x-ray department, and it also provides a number of facilities not generally available in private hospitals such as special facilities for psychiatric treatment, physical therapy, and its own blood bank. Its emergency room, modern in every respect, is open 24 hours a day, seven days a week, and treats an average of 800 patients a month. Any and all patients are cared for at the emergency room, and no discussion of charges or ability to pay takes place until treatment has been rendered.

Educational activities are also carried on, including approved residency and internship programs, schools of medical and x-ray technology and a program in hospital administration.

Regarding Richmond Eye Hospital, the record discloses that it originated from two bequests, totaling $400,000, together with $50,000 from other private sources. The balance of the construction cost of approximately $775,000 was provided by the Federal and State governments. With these funds a 40-bed specialty hospital for treatment of eye, ear, nose and throat diseases was constructed and began operations in 1952.

Like Richmond Memorial, this hospital relies primarily on patient charges to cover operating expenses. In six of the seven years of operation it has operated at a deficit. This is an open staff hospital, its relationship with the doctors practicing therein being substantially the same as applies to Richmond Memorial.

The hospital is open to any patient who applies, and no patient requesting free care has been turned down. The same care is provided all patients, whether they pay the full rate or nothing. The amount of free care expressed in terms of patients and value of free

service rendered has increased each year as funds have become available.

The real issue in the case may be stated as follows: Whether in the case of hospitals otherwise qualified in every respect under Section 183 (e) of the Constitution, the right to exemption from taxes depends solely upon the extent to which free service is rendered?

The city takes the position that the question must be answered in the affirmative; that hospitals "conducted not for profit, but exclusively as charities" within the meaning of the section are hospitals "where charity patients are cared for in *considerable* numbers and the primary purpose of which, or a major purpose of which, is to care for * * * indigent or medically indigent persons * * *." In other words, the city insists that there must always be a "substantial" or "considerable" amount of free service.

On the other hand the hospitals take the position that the extent or amount of free service rendered is not controlling; that whether a hospital is *willing* to render free service is a relevant factor but the extent of such service actually rendered has no bearing upon the charitable status.

The city in its brief states that free patients are not cared for in "considerable numbers", and then argues that this alone deprives the hospitals of the tax exemption.

The word "considerable" is a relative term. The record discloses that both hospitals render free service to patients. The exemption provided in Section 183 (e) of the Constitution is one of law. For this the city would substitute a rule of arbitrary discretion which would of necessity have to be exercised by local tax authorities throughout the Commonwealth where hospitals of this character are located. Such arbitrary discretion would be without objective standards. A tax exemption cannot depend upon any such vague and illusory concept as the percentage of free service actually rendered. This would produce chaotic uncertainty and infinite confusion, permitting a hodgepodge of views on the subject. Thus there would be no certainty nor uniformity in the application of the section involved.

The pertinent provision of the section is that it exempts from taxation "real estate belonging to, actually and exclusively occupied and used by * * * hospitals * * * conducted not for profit, but exclusively as charities, * * *." Three conditions must exist in order to satisfy this constitutional provision: (1) The real estate

must belong to and be actually and exclusively occupied and used by the hospital; (2) the hospital must be operated not for profit; (3) the hospital must be operated exclusively as a charity. Clearly, conditions (1) and (2) have been met.

As to condition (3), the section reads "not for profit, but exclusively as charities." The word "exclusively" has never been considered an absolute term. The city contends that if there is a "substantial" or "considerable" amount of free service then the hospital is a charitable institution and exempt from taxation.

We hold that the section takes its color from the phrase "not for profit", which delineates the character of the institution. Whether these hospitals are "conducted not for profit, but exclusively as charities," within the meaning of the constitutional provision, depends not upon the number of patients who are treated free of charge, but the nature of the institutions and the purpose of their operations. The nature of these institutions, the purpose and use to which they are put, all combine to show that they are operated "exclusively as charities."

These hospitals were built through charitable impulses. Over thirty thousand charitably inclined citizens contributed to the construction. Added to this were public funds from the Commonwealth of Virginia and the Federal government. The contributions were for the purpose of creating institutions where sick people could be treated and cared for. Patients who are able to pay do pay, and those who cannot pay do not pay. The citizens who contributed to the hospitals can never get a return in money from their contributions. The charters of the corporations do not permit it, and the donors do not expect it.

There is no wording in Section 183(e) requiring free care or free service. The phrase "exclusively as charities", describes the institutions entitled to exemption. It does not designate whether the service rendered by them shall be free to the recipients. If the framers of the Constitution had so intended it would have been easy and natural to have specified the rendering of free service as the basis for the exemption.

The framers of the (1902) Constitution presumably knew that such charitable organizations as YMCA's, asylums, and hospitals customarily charge for services. Thus while some or all of the charities specified in Section 183(e) may render more or less free

service, the language of the Constitution contains no such requirement.

We have not before had occasion to decide a hospital case such as here involved, bringing under construction Section 183(e) of the Constitution. However, in the case of *Commonwealth* v. *Lynchburg YMCA* (1914), 115 Va. 745, 80 S. E. 589, where the city challenged the tax exemption because charges were made for the occupancy of rooms and the use of facilities, we sustained the tax exemption and held that the YMCA had not lost its exemption status by charging or collecting dues and fees from those who could afford to pay.

The city here attempts to dispose of that case by arguing that the property of a Young Men's Christian Association is exempt simply by virtue of being the property of the Young Men's Christian Association. Such argument ignores the fact that the phrase "conducted not for profit, but exclusively as charities" qualifies each and every one of the institutions enumerated in Section 183(e), including hospitals as well as YMCA's.

In the *Lynchburg YMCA* case (115 Va. 753, 754) we quoted with approval from the opinion in *Yale University* v. *Town of New Haven*, 71 Conn. 316, 42 Atl. 87, 43 L. R. A. 490, as follows:

"* * * (W)here the statute provided that 'buildings or portions of buildings exclusively occupied as colleges, academies, churches, public school houses, or infirmaries' should be exempt from taxation, it was held that fees of students, whether apportioned as room rent or tuition, could not be treated as income of real estate. In discussing the question the court said: 'The fact that certain sums are paid for the use of the rooms occupied does not alter the character of the occupation. A church is none the less a church because the worshipers contribute to the support of the services by way of pew rent. A hospital is none the less a hospital because the beneficiaries contribute something towards its maintenance. And a college is none the less a college because its beneficiaries share the cost of maintenance; and it is immaterial whether such contribution is lumped in one sum or apportioned to sources of expense, as tuition, room rent, lecture fees, dining hall,' &c."

The *Lynchburg YMCA* case was decided in 1914, twelve years after the adoption of the Constitution of 1902. There we approved the statement that a hospital, otherwise entitled to the exemption, did not lose its status as a result of making charges to those who could afford to pay.

■ The charitable status of hospitals in Virginia has been raised in several tort cases. While these cases do not directly involve Section 183 (e), they do decide principles which are highly persuasive of the real issue involved in the instant case. They establish that hospitals, like the two here involved, are "charitable" institutions despite the fact that they charge all who can afford to pay. The first of these cases is *Hospital of St. Vincent* v. *Thompson*, (1914), 116 Va. 101, 81 S. E. 13. There we held that a hospital which is chartered to care for sick and disabled persons, which has no capital stock and is not conducted for dividends and profits is a charity hospital, and the fact that it receives compensation from patients who are financially able to pay for the accommodation received does not render it any less a charitable institution in the eyes of the law. Other cases holding to the same effect are: *Weston's Adm'x* v. *Hospital of St. Vincent, Etc.* (1921), 131 Va. 587, 107 S. E. 785; *Memorial Hospital, Inc.* v. *Oakes, Adm'x* (1959), 200 Va. 878, 108 S. E. 2d 388.

While the Virginia cases discussed above resolve the principles which we hold to be applicable here, other jurisdictions also hold in accord with our views.

In *Brattleboro Retreat* v. *Town of Brattleboro* (1934), 106 Vt. 228, 173 Atl. 209, the Supreme Court of Vermont upheld the hospital's tax exemption even though none of the patients was admitted without charge. In the court's opinion the case of *Commonwealth* v. *Lynchburg YMCA, supra*, is cited (173 Atl., at 212-213) for the authority that, "The fact that none of its patients are cared for without charge does not deprive it of its charitable feature. * * * We think that plaintiff's property is used for a charitable purpose within the meaning of our statute and consequently is exempt from taxation * * *." See also *Fredericka Home For the Aged* v. *San Diego County* (1950), 35 Cal. 2d 789, 221 P. 2d 68, 71.

■ The record discloses that there are throughout Virginia more than forty non-profit community hospitals such as the two here involved, none of which has been assessed for taxation. While such is not conclusive, we have held that the practical construction traditionally followed by public officials in the exercise of their duties should be accorded weight in statutory construction. *Commonwealth* v. *Appalachian Electric Power Co.* (1951), 193 Va. 37, 45, 46, 68 S. E. 2d 122, 127.

The General Assembly of Virginia also has placed its interpreta-

tion upon Section 183 (e) of the Constitution. The amendment of 1954 to § 58-12 (5) of the Code, which defined hospitals conducted not for profit but exclusively as charities to include "hospitals operated by non-stock corporations not organized or conducted for pecuniary profit but which may charge persons able to pay in whole or in part for their care and treatment," clearly indicates that the General Assembly does not consider the provision or extent of free service as the test of a charitable hospital under Section 183 (e) of the Constitution.

While the General Assembly cannot construe away the Constitution or change it, the quoted section (58-12(5)) shows how it interprets this section of the Constitution, and although this interpretation is not binding upon the court it is persuasive.

In addition to what has been said, these hospitals in a very practical sense are engaged in a work of charity where the "pay patients" as well as those who do not pay are the beneficiaries thereof. This is so for the reason that but for the charitable gifts made to the hospitals and the charitable work which they are carrying on they would not exist to serve any patients. *Ettlinger* v. *Trustees of Randolph-Macon College* (4th Cir. 1929), 31 F. 2d 869.

The legal interpretation of the phrase "not for profit, but exclusively as charities", is not controlled by free service to the indigent or poor. Non-profit hospitals which are devoted to the care of the sick, which aid in maintaining public health, and contribute to the advancement of medical science, are and should be regarded as charities.

Thus we hold that hospitals not operated for profit, which devote all of their funds exclusively to the maintenance of the institutions, are charities, and this is so irrespective of the fact that a majority of their patients are required to pay for services rendered. *People ex rel. Doctors Hospital, Inc.* v. *Sexton* (1945), 267 App. Div. 736, 48 N.Y.S. 2d 201 (1st Dep't 1944), aff'd *per curiam*, 295 N. Y. 553, 64 N. E. 2d 273; *Southern Methodist Hospital* v. *Wilson* (1938), 51 Ariz. 424, 77 P. 2d 458.

The city next contends that if we hold the hospitals here involved exempt from taxation, Richmond Memorial Hospital should not be exempt from taxation for the years 1956 and 1957 because on January 1st of these years the hospital building was under construction and not being used as a "hospital".

In the first place this question is not properly before us. The

question was not raised in the lower court and violates our Rule 1:8. In the second place there is no merit in the contention. It is a matter of common knowledge that where property is being developed for an intended use actual physical occupancy cannot begin immediately. This hospital existed as a corporate entity before it was a hospital in brick and mortar, and as a corporate entity it was occupying and using its real estate during the two years in question to develop the hospital in the physical sense.

In other words, it is not necessary that actual physical use of property for an exempt purpose be commenced before it is entitled to be exempted from taxation. It is sufficient if it is acquired by the organization entitled to the exemption, with the intention of, within a reasonable time, devoting it to an exempt use. *Carney* v. *Cleveland City School District Public Library* (1959), 169 Ohio St. 65, 157 N. E. 2d 311, 313, 314; *Hedgecroft* v. *City of Houston* (1951), 150 Tex. 654, 244 S. W. 2d 632, 636; *In re Assessment of Property of Zion Lutheran Church* (1949), 202 Okla. 174, 211 P. 2d 534.

There is no merit in the remaining assignments of error, and the judgments are

*Affirmed.*