MILWAUKEE PROTESTANT HOME FOR THE AGED, Appellant, v. CITY OF MILWAUKEE, Respondent.*

*No. 40. Argued October 30, 1968.—Decided February 4, 1969.*
(Also reported in 164 N. W. 2d 289.)

* Motion for rehearing denied, with costs, on April 1, 1969.

286

For the appellant there were briefs by *Churchill, Duback & Smith* and *Gibbs, Roper & Fifield,* all of Milwaukee, and oral argument by *Thomas B. Fifield.*

For the respondent there was a brief by *John J. Fleming,* city attorney, and *Maurice L. Markey,* assistant city attorney, and oral argument by *Mr. Markey.*

A brief *amicus curiae* was filed by *John William Calhoun* of Fond du Lac, for the Wisconsin Council of Homes for the Aging, Inc.

ROBERT W. HANSEN, J.   Traditionally, in America old people's homes provided for the necessitous poor. Usually, such homes for the aged were established and maintained by religious and benevolent associations. Typically, they required for admission a lump-sum entry fee, in consideration for which the resident secured a life contract for the providing of board, lodging, medical services if needed and other incidental services. Often enough, such old folks' homes represented the only available alternative to the trip "over the hill to the poorhouse" or county almshouse.

Recent decades have added new dimensions to retirement living. Old age and survivors' benefits under the Social Security Act, combined with private annuities and industrial pension plans, have provided most older persons in the nation an assured income for their retirement years. Many Americans retire earlier than they once did and most Americans retire with at least modest incomes available for their retirement living. Such retirees are not sick, not senile, not penniless. However, they

do face a variety of personal and interpersonal problems, not necessarily economic in nature. An increasing number of retired persons seek the type of congregate living in retirement homes that will provide companionship, maintain self-respect and offer protection against the ravages that declining years may bring.

To meet the needs, wants and expectations of such retired persons, retirement homes for the aged have developed, either as independent institutions or as wings or additions to existing homes for the aged. Such retirement homes for the aged are not primarily nursing homes or hospitals. They are not almshouses, and the residents do not consider themselves objects of public or private charity. They are what the name implies, homes for retired persons, places of congregate living where retirees go to live, expecting to pay the fees charged and to receive the usual incidents of group home living.

If operated on a fee-charging but nonprofit basis, do such retirement homes for the aged qualify for tax exemption under statutes exempting from taxation benevolent or charitable institutions? If so, under what circumstances? What distinguishes the benevolent undertaking, operated not for profit, from the private operation, operated as a business enterprise? Increasingly, this question is coming to the courts for the interpretation and application of existing statutes to retirement homes for the aged. Most state courts appear to be answering that such providing of paid-for services to aged persons of modest resources and income is an act of benevolence or charity. Such courts adopt what this court, with approval, has called ". . . broad definitions of 'charitable' institutions which do not embody the idea of giving away something free." [1] However, some states adopt

---

[1] *Duncan v. Steeper* (1962), 17 Wis. 2d 226, 234, 116 N. W. 2d 154 and cases cited therein. *See also Bozeman Deaconess Foundation v. Ford* (Mont. 1968), 439 Pac. 2d 915, 918, stating, "The scope of charity and the standards under which it is administered are not frozen by the past, but keep pace with the times and the new

a narrower definition of benevolence or charity, requiring some degree of almsgiving or unpaid service to the destitute as the *quid pro quo* for tax exempt status.[2]

In Wisconsin, the question of public policy involved has been settled by the legislature, Wisconsin long has exempted from taxation property of a benevolent association, used exclusively for benevolent purposes and not used for profit.[3] In 1967, the Wisconsin legislature amended this statute to specifically add "benevolent nursing homes and retirement homes for the aged" as

conditions and wants of society." *See also Topeka Presbyterian Manor v. Board of County Commissioners* (1965), 195 Kan. 90, 98, 402 Pac. 2d 802. "Many of the people who have been or . . . will in the main be self-supporting persons who would not be willing to be classified as recipients of charity in the ordinary meaning of that term, yet the state does have a distinct interest in the well-being of this class of citizens by reason of their advanced age." *See also Fredericka Home v. County of San Diego* (1950), 35 Cal. 2d 789, 795, 221 Pac. 2d 68, holding ". . . it is our conclusion that where, as here, the payments made by the elderly residents are within the reach of persons of limited means, where such payments are not commensurate with the benefits derived, where there is no element of private gain, and where all the income of the institution—including that received from residents and the substantial portion received from gifts and other sources—is devoted exclusively to affording a reasonable standard of care to such elderly persons for the balance of their lives, the concept of charity in its ordinary sense, as well as under a strict but reasonable construction of the welfare exemption law, is met."

[2] *See Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 233 N. E. 2d 537; *Haines v. St. Petersburg Methodist Home, Inc.*, (Fla. 1965), 173 So. 2d 176; *Friendsview Manor v. State Tax Commission* (1966), 247 Or. 94, 420 Pac. 2d 77, affirmed on rehearing 427 Pac. 2d 417.

[3] Sec. 70.11 (4) providing exemption for *"Property owned and used exclusively* by . . . religious, educational or *benevolent associations* . . . but not exceeding 10 acres of land necessary for location and convenience of buildings *while* such property is *not used for profit."* (Emphasis supplied.)

included in the tax exemption statute.[4] This 1967 amendment did not change the existing law as to retirement homes for the aged. It merely clarified the legislative intent, and the reasons for such legislative clarification were set forth.[5]

So the question before us is not whether operating a retirement home for the aged is a proper function of a benevolent institution. The legislature has answered that. The sole question here is whether the Milwaukee Protestant Home for the Aged meets the standards as to non-profit operation set forth in the tax exemption statute.

In order for a retirement home for the aged or a nursing home or a hospital to qualify for exempt status under sec. 70.11, Stats., ". . . it must appear that, (1) appellant is a benevolent association; (2) the personal property is used exclusively for the purposes of such association; (3) the real and personal property is not used for pecuniary profit." [6] In examining the organizational structure and method of operation, "The facts of each case must be regarded *as a whole* . . . ." [7] (Emphasis supplied.)

---

[4] Ch. 64, Laws of 1967, adding to sec. 70.11 (4), Stats. ". . . including benevolent nursing homes and *retirement homes for the aged.*" (Emphasis supplied.)

[5] The Report of the Joint Survey Committee on Tax Exemption of the Wisconsin Legislature states as to Ch. 64, Laws of 1967: *"Purpose of the Bill.* This bill would clarify the present exemption accorded to a limited amount of property owned by benevolent associations by making it clear that the exemption covers benevolent nursing homes and homes for the aged.

". . .

*"Public Policy Involved.* The substitute amendment is desirable as a matter of public policy as it clarifies an existing statute which has been misinterpreted by some local property assessing offices."

[6] *Prairie du Chien Sanitarium Co. v. Prairie du Chien* (1943), 242 Wis. 262, 264, 7 N. W. 2d 832.

[7] *Id.* at page 265.

No claim is made that the Milwaukee Protestant Home for the Aged is not a benevolent association within the meaning of sec. 70.11 (4), Stats. None could be made. Organized in 1884, the Protestant Home is one of the oldest and most respected benevolent organizations in this state. It is a nonstock, nonprofit, membership corporation. It has always operated at a deficit which has had to be made up by donor's gifts, withdrawals from its endowment fund and on occasion by help from the local Community Fund. Its operating deficit for the year 1965 was $386,087.

As to the "exclusive use" of the property for the purposes of the association, we deal here with a single site and a single institution. The specific purpose of the Protestant Home, as set forth in its present charter is ". . . specifically, to own and operate a residence and nursing home for aged persons and to do and perform any and all acts as may be necessary to the furtherance of such purposes." That is what it does and all that it does.

We do not deal here with any tainting of the exclusiveness of use by some paralleling gain or profit to any person or persons. Not only do the articles of incorporation prohibit any payments to officers, members or any individual, the fact is that no one has received any such profit from the operation of the home since 1884. No member, director or officer has ever received any pecuniary benefit for so serving. In fact, they have never received reimbursement for their actual expenses.

In this state a benevolent association must be completely free from the fact or even possibility of profits accruing to its founders, officers, directors or members.[8]

---

[8] *Prairie du Chien Sanitarium Co. v. Prairie du Chien* (1943), *Id.* at page 267, holding hospitals not tax exempt ". . . when members of the owner association are using the hospital as an adjunct to their private business in such a way that it becomes a source of substantial help in the matter of earnings to be derived from the practice of their profession." *See also Rogers Memorial Sanitarium v. Summit* (1938), 228 Wis. 507, 279 N. W. 623; *River-*

The Protestant Home is 100 percent free of such possibility of profit accruing to anybody. As this court said in another case: "The instant corporation is a benevolent institution because the members who operate it are in the work of benevolence and receive and can receive no remuneration or compensation whatever for their services." [9]

The sole remaining hurdle is whether the Milwaukee Protestant Home for the Aged, or any part of it, [10] is being operated "for pecuniary profit." The challenge here is to the fact that the combination of founders' fee payments plus occupancy charges required of initial residents (in the addition) exceed the present operating costs of the addition only. Such net receipts are, however, paid into the endowment fund of the home, constituting a repayment by installments of the loan from the fund which made possible the erection of the addition. They are and can be used only to carry on the work of the Home. Do such payments on such loan to such endowment fund spell an operating "for pecuniary profit?"

view Hospital v. Tomahawk (1943), 243 Wis. 581, 11 N. W. 2d 188; Bethel Convalescent Home v. Richfield (1961), 15 Wis. 2d 1, 111 N. W. 2d 913.

[9] Order of the Sisters of St. Joseph v. Plover (1941), 239 Wis. 278, 284, 1 N. W. 2d 173. See also In re Claim of Assembly Homes v. Yellow Medicine County (1966), 273 Minn. 197, 204, 140 N. W. 2d 336, holding a Clarkfield nursing home a "purely public charity" because "Its charter, its bylaws, its policy, and the conduct of its operations establish that it was not organized for private profit. . . . any profits derived from its operations go to the furtherance of its work as a nursing home. Its shareholders cannot receive dividends and hold stock for life and at the death of a shareholder his stock reverts to the corporation. Its charges for services are paid for by individual patients, by county welfare boards, and by the U. S. Veterans Administration. Private donations of money or services also contribute to its maintenance."

[10] Sec. 70.11 (8) "TAXED IN PART. Where property for which exemption is sought pursuant to this section is used in part for exempt purposes and in part for pecuniary profit, then the same shall be assessed for taxation at such percentage of the full market

Where income comes from and where it goes are alike material in determining whether there is an operating "for pecuniary profit" under the statute. It is not an excess of income over outgo to which the statute refers. A benevolent association is not required to use only red ink in keeping its books and ledgers.[11] The statutory reference is only to income from activities ". . . not . . . within the objects of such organization."[12] Founders' fees and service charges paid by residents of the addition are here used solely to carry on the corporate purpose: i.e., operating a residence for the aged. In addition, where, as here, the net receipts from operating the addition are required and used to repay construction costs of the addition, there is no element of pecuniary profit to anyone involved. As this court stated in the *Sisters of St. Joseph Case*:

"The respondent's claim is to the effect that the River Pines Sanatorium should be taxed on the ground that it aims to operate at a profit . . . all benevolent institutions endeavor so to operate. But *as the profit* made by these institutions, if any, *is payable to nobody, but is only turned back into improving facilities* or extending the benevolence in which the institutions are primarily engaged, *the profit element becomes immaterial.*"[13] (Emphasis supplied.)

value of said real and personal property as shall fairly measure and represent the extent of such use for pecuniary profit."

[11] "To deny an otherwise qualifying institution charitable status because it is efficiently organized and managed, so as to operate in the black, would be not only illogical but also extremely detrimental to the incentive for sound management in such institutions." *Duncan v. Steeper* (1962), 17 Wis. 2d 226, 236, 116 N. W. 2d 154.

[12] Sec. 70.11(8) in pertinent part providing, ". . . the term 'pecuniary profit' as used in this section is hereby defined as the use of any portion of said premises or facilities for purposes *not directly included within the objects of such organization* for which use compensation is received . . . ." (Emphasis supplied.)

[13] *Sisters of St. Joseph v. Plover, supra. See also St. Joseph's Hospital Asso. v. Ashland County* (1897), 96 Wis. 636, 72 N. W.

The gain or profit which takes away the benevolent nature and character of the institution is profit to someone other than the benevolent association itself.[14] In this case, the fact that there is some present margin of income in operating the addition does not militate against the objectives for which the plaintiff was organized but rather promotes such objectives.

Where there is no element of gain to anyone and where all of the net income is devoted exclusively to carrying on the benevolent purposes of the institution, there is not an operating "for pecuniary profit." The requirement of a founders' fee and occupancy charges does not change the basic benevolent purpose and character of the Milwaukee Protestant Home for the Aged or of its Bradford Terrace Addition.[15] Charging pew

43, holding "The fact that there were surplus receipts at times, which were loaned to build other hospitals of the same character, does not show that the property was used for pecuniary profit."

[14] ". . . the gain or profit which destroys the charitable character of a corporation is that which inures to the benefit of its members and is not affected by the fact that the corporation's income may exceed its operating expenses." *Duncan v. Steeper, supra,* at page 234, citing *Associated Hospital Service v. Milwaukee* (1961), 13 Wis. 2d 447, 466, 109 N. W. 2d 271 in which this court stated "The fact that plaintiff's income exceeds its disbursements does not necessarily destroy its nonprofit character. Whether dividends or other pecuniary benefits are contemplated to be paid to its members is generally the test to be applied . . . ." *See also Riverview Hospital v. Tomahawk* (1943), 243 Wis. 581, 11 N. W. 2d 188, holding "The test is its origin and the objects of its organizers, its complete dedication to charitable purposes, and absolute divorce from gain to those controlling ownership."

[15] Where residents of a home for the aged paid occupancy fees and maintenance charges substantially higher than those involved in our case, the Montana Supreme Court held the home was nonetheless organized and operated on a nonprofit basis, stating: ". . . we have a facility operating without profit or profit motive, making care available to the aged in good health and bad, under circumstances where the fullness of their life is promoted and impositions of the frailties of declining years are spared their children, relatives and the public authorities. Its property and

rent does not make a church not a church.[16] This is particularly true where the occupancy charges are reasonably required by the necessities of the situation and reasonably related to the maintenance of the institution and the extension of its services.[17]

The city would add a fourth hurdle to the three established by the statute, *i.e.,* that some percentage of per-

---

facilities are devoted exclusively to those purposes. It is a purely public charity . . . ." *Bozeman Deaconess Foundation v. Ford* (1968), *supra.*

[16] "The fact that certain sums are paid for use of the rooms occupied, does not alter the character of the occupation. A church is none the less a church, because the worshippers contribute to the support of services by way of pew rent. A hospital is none the less a hospital, because the beneficiaries contribute something towards its maintenance. And a college is none the less a college, because its beneficiaries share the cost of maintenance; and it is immaterial whether such contribution is lumped in one sum, or apportioned to sources of expense, as tuition, room rent, lecture fee, dining-hall, etc." *Yale University v. Town of New Haven* (1899), 71 Conn. 316, 328, 42 Atl. 87.

[17] "Defendant's challenge . . . stems primarily from the fact that plaintiff does not extend free services to the poor, but the welfare exemption law . . . makes no such requirement as a qualifying factor for the tax exemption, and if such condition were intended, appropriate language to that effect could readily have been adopted. . . . the controlling consideration in determining whether an institution such as plaintiff should be classified as a charitable one is not whether a few or all of the recipients of its benefits may make reasonable contributions toward defraying the cost of such benefits, but whether such contributions as are made do not exceed what is required for the maintenance of the institution at a reasonable standard and are devoted to the purpose for which the institution was founded, which purposes, in the absence of the required contributions, would clearly be deemed to be charitable." *Fredericka Home v. County of San Diego, supra,* page 793, holding that where the minimum admission fee to a home for the aged was fixed at $5,500, the charge of fees by a home for the aged will not necessarily prevent its classification as charitable if such sums ". . . go to pay the expenses of operation and not to the profit of the founders or shareholders." *See also Scripps Memorial Hospital v. California Employment Comm.* (1944), 24 Cal. 2d 669, 675, 151 Pac. 2d 109.

sons unable to pay anything at all be admitted without charge to the addition. Adding the requirement of entirely free services to some residents is predicated on (1) presuming "benevolent," the word used in the Wisconsin statute to mean the same as "charitable;" (2) defining "charity" to require giving away something to someone without charge; (3) contending that nothing can be "benevolent" if it is not also "charitable" in the narrowest sense of that word. The semantics and logic are alike.

It goes beyond definition and interpretation of words to equate "benevolent" with "charitable" and then give "charity" a definition narrower than "benevolence." [18] Of course, if "charity" is broadly defined, it can mean the same as "benevolence." [19] However, in the minds of

[18] "The word 'benevolent' means, literally, 'well-wishing.' It is a word of larger meaning than 'charitable.' It has been well said that, 'though many charitable institutions are very properly called benevolent, it is impossible to say that every object of man's benevolence is also an object of his charity.' " J. WINSLOW, in *St. Joseph's Hospital Asso. v. Ashland County* (1897), 96 Wis. 636, 639, 72 N. W. 43. *See also* 14 C. J. S., p. 412, sec. 1, ". . . while charity may be benevolence, . . . all benevolence is not necessarily charity, as the term is a broader one than 'charity.' "

[19] ". . . 'aged people require care and attention apart from financial assistance, and the supply of this case and attention is as much a charitable and benevolent purpose as the relief of their financial wants' . . . So the charge of fees by such an institution as a home for the aged will not necessarily prevent its classification as charitable if such sums 'go to pay the expenses of operation and not to the profit of the founders or shareholders,' for all persons may 'under certain conditions be proper objects of charity.' . . . In short, as the word 'charity' is commonly understood in modern usage, it does not refer only to aid to the poor and destitute and exclude all humanitarian activities, though rendered at cost or less, which are maintained to care for the physical and mental well-being of the recipients, and which make it less likely that such recipients will become burdens on society." *Fredericka Home v. County of San Diego* (1950), quoting *Estate of Henderson* (1941), 17 Cal. 2d 853, 112 Pac. 2d 605, also holding "Relief of poverty is not a condition of charitable assistance. If the benefit conferred has a sufficiently widespread social value, a charitable

some, the phrase "objects of charity" still conjures up a soup kitchen picture of penniless drifters lined up outside a skid row mission. Concern for the plight of the entirely destitute has its proper place, but the word "benevolent" has no in-built implication or requirement of almsgiving. To help retired persons of moderate means live out their remaining years is "benevolent" whether or not it is also considered, as we would consider it to be "charitable."

In any event, the legislature has not required that a benevolent association maintaining a retirement home for the aged and operating it not for profit is required to extend free services to at least some of its residents. This is a "mistaken view" whether applied to benevolent retirement homes for the aged or to charitable hospitals.[20] If the legislature had intended that a benevolent association must provide free admission or free services to all or some of the residents in its retirement home, it is to be expected that it would have so provided. Under the statute as written, it is the basic nature of the in-

---

purpose exists. . . . aged people require care and attention apart from . . . financial wants."

[20] It is apparent that respondents harbor the mistaken view that an institution cannot be a charitable hospital unless it extends direct charity to at least some of its patients in the form of free service, or charges less than the cost of its services. This view was eloquently refuted by the Massachusetts court in the recent case of *Barrett v. Brooks Hospital* (1959), 338 Mass. 754, 157 N. E. 2d 638 at page 759: "The defendant's charter does not contain any such word as 'indigent.' That is not necessary. 'Charity in the legal sense "is not confined to mere almsgiving or the relief of poverty and distress, but has a wider signification, which embraces the improvement and promotion of the happiness of man." ' . . . In the instant situation, the record clearly establishes that Methodist Hospital utilizes any profits for purposes that will better enable it to function as a hospital and nurses' training school. This is because profits are used for debt retirement, plant expansion, and modernization of facilities, and cannot inure to the benefit of members either currently or upon dissolution." *Duncan v. Steeper, supra,* at page 235.

stitution and the dominant purpose of the operation controls.[21]

Nor can the rule of strict construction of tax exemption statutes be used to add such additional requirement for tax exemption. Even strict construction must be a reasonable interpretation of the language used. As this court very recently said:

"However, a strict construction is nonetheless a construction, and an exemption statute need not be given an unreasonable construction or the narrowest possible construction. A 'strict but reasonable' construction seems to be the pithy and popular statement of the rule." [22]

Finally, the city contends that we must view the Bradford Terrace Addition under a microscope, blocking out the rest of the institution of which it is a part. The Protestant Home argues that it is entitled to have the institution telescopically viewed in its entirety as one entity. Actually, we must do both. Under the Taxed In Part Statute,[23] each part of the enterprise is to be tested separately as to whether it is being operated for pecuniary profit. However, it remains a part of the whole. Nonetheless, there is one Milwaukee Protestant Home for the Aged, not two. Geographically, all facilities are at a single site. Financially, all income from every part goes to sustain and maintain the single institution. Functionally, all phases of the operation have one common denominator: Serving aged and retired persons.

---

[21] "Whether these hospitals are 'conducted not for profit, but exclusively as charities,' within the meaning of the constitutional provision, depends not upon the number of patients who are treated free of charge, but the nature of the institutions and the purpose of their operations. . . . There is no wording in Section 183 (e) requiring free care or free service." *Richmond v. Richmond Memorial Hospital* (1960), 202 Va. 86, 91, 116 S. E. 2d 79.

[22] *Columbia Hospital Asso. v. Milwaukee* (1967), 35 Wis. 2d 660, 668, 151 N. W. 2d 750.

[23] Sec. 70.11 (8), Stats., *supra*.

The fact of differing requirements for admission and occupancy in the newest addition is to be considered, but the relationship of the part to the whole is not to be ignored. The addition to the Protestant Home is the equivalent of a new wing on an existing hospital.[24] A wing need not be chopped off a chicken to determine its form or function. This question was before this court recently in a challenge to the tax exempt status of two four-unit apartment buildings maintained for hospital personnel, two miles from the hospital itself. In holding such buildings to be tax exempt, this court found the owner, St. Luke's Hospital, to be ". . . primarily a service organization fulfilling the needs of patients, doctors, and the public generally and *in order to do this,* it must offer a multitude of services and facilities . . . ."[25] (Emphasis supplied.) The addition on the grounds of the Protestant Home is at least as integral a part of the institution as were the hospital-owned apartment buildings. It is the functional relatedness, not the physical separateness that provides the connecting link in both cases.

Since the Milwaukee Protestant Home for the Aged is organized as a nonstock, nonprofit, membership corporation solely for charitable purposes—since no portion of the association's net earnings may or ever have been

---

[24] Where a Pennsylvania hospital maintained one of its buildings for more affluent patients, but used the profits derived therefrom for its general purposes, the hospital was held exempt in its entirety. The trial court found: "It is manifestly absurd, and would be unjust to the institution, in determining its character, to separate it into parts and except out of its vast and varied system of humane service any particular department, house or class of patients, for independent characterization. All of its property is undoubtedly used in the line of the charitable purpose of its incorporation, and the ultimate test of its character must be the result of its work as a whole." *Philadelphia v. Pennsylvania Hospital* (1890), 8 Pa. Co. Ct. Rep. 72, 73, affirmed in, 154 Pa. St. 9, 25 Atl. 1076 (1893).

[25] *Columbia Hospital Asso. v. Milwaukee, supra,* page 667.

distributable to its officers, directors, members or any individual—since all net earnings of the Protestant Home, and any part of it, are turned back into the association and used only to improve its facilities and extend its services—since the founders' fees and occupancy charges paid by initial residents of the Bradford Terrace Addition are entirely returned to the endowment fund from which funds for constructing the addition were borrowed—since the addition and its top two floors used as a convalescent center are an extension of the benevolent purposes of the Protestant Home and are not being operated for profit—we conclude that the property of the Milwaukee Protestant Home for the Aged, including the Bradford Terrace Addition and its convalescent center, is exempt from property taxation pursuant to sec. 70.11 (4), Stats.

*By the Court.*—Judgment reversed.

BEILFUSS, WILKIE and HEFFERNAN, JJ. (*dissenting*). We respectfully dissent from the opinion of the majority and conclude that the Bradford Terrace Addition (less the value of the physical therapy rooms) as presently operated is not exempt from property taxation.

In considering tax exemption problems we start with the proposition that all property must be uniformly taxed. An exemption of property lowers a municipal tax base and transfers its burden of taxation to others. For this reason, at least, tax exemption statutes are usually strictly construed against exemption.

In the recent case of *Engineers & Scientists v. Milwaukee* (1968), 38 Wis. 2d 550, 553, 157 N. W. 2d 572, we stated:

"One who seeks to have his property exempt from taxation is required to bring himself within the terms of the exemption statute. This court has frequently stated that taxation is the rule and that exemption from taxation is the exception. In *Bethel Convalescent Home v. Richfield* (1961), 15 Wis. 2d 1, 4, 111 N. W. 2d 913, we quoted

with approval the rule stated in *Madison Aerie No. 623 F. O. E. v. Madison* (1957), 275 Wis. 472, 476, 82 N. W. 2d 207:

"' "Statutes exempting property from taxation are to be strictly construed and all doubts are resolved in favor of its taxability. To be entitled to tax exemption the taxpayer must bring himself within the exact terms of the exemption statute." '

"In the recent case of *Columbia Hospital Asso. v. Milwaukee* (1967), 35 Wis. 2d 660, 668, 669, 151 N. W. 2d 750, we pointed out that:

"' . . . a strict construction is nonetheless a construction, and an exemption statute need not be given an unreasonable construction or the narrowest possible construction. A "strict but reasonable" construction seems to be the pithy and popular statement of the rule. [Citing cases.] The difference between a liberal and a strict construction is best illustrated in those cases where the meaning of the language expressing the objective intent of the legislature is doubtful; in such cases, any doubt under the strict construction rule must be resolved against the exemption. Thus an exemption should be expressed in such clear language as to leave no doubt.' "

We will refer to the 1963 Bradford Terrace Addition as "Bradford Terrace," and all the other wings and facilities as the "Home."

There is no contention by the city that the Home and its facilities are not exempt from general property taxation as being charitable or benevolent associations. The question is whether Bradford Terrace is exempt because of the manner in which the founders' fee method of financing is utilized. As now operated, does Bradford Terrace perform a benevolent service?

The charter of the appellant in 1956 provided:

"Article 2. The purpose shall be to provide a home for aged persons who are unable to care or provide for themselves and to engage in any lawful activity . . . ."

On November 8, 1960, it was amended to read:

"Article 2. The corporation is organized solely for charitable purposes and, specifically, to own and operate

a residence and nursing home for aged persons and to do and perform any and all acts as may be necessary to the furtherance of such purposes . . . ."

The major hurdle in appellant's path, as we see it, is the contention that residents of Bradford Terrace are, in effect, the recipients of their own benevolence for they, as paying residents, and no others, enjoy all the facilities of Bradford Terrace.

To overcome this hurdle the majority states that the concepts of benevolence and charity can be given a broad enough interpretation to include all the needs of aged persons, physical and mental, as well as financial. Further, the fact that the operation shows a profit or that its services are not offered at less than cost does not in itself destroy the charitable nature of the association. In support of its position it cites *Duncan v. Steeper* (1962), 17 Wis. 2d 226, 233, 234, 116 N. W. 2d 154. A quotation from the case is:

"It is apparent that respondents harbor the mistaken view that an institution cannot be a charitable hospital unless it extends direct charity to at least some of its patients in the form of free service, or charges less than the cost of its services. . . .

". . .

"In *Associated Hospital Service v. Milwaukee* (1961), 13 Wis. (2d) 447, 460, 109 N. W. (2d) 271, this court pointed out that some courts have adopted broad definitions of 'charitable' institutions which do not embody the idea of giving away something free. As an example we therein cited *Rueda v. Union Pacific R. Co.* (1946), 180 Or. 133, 169, 175 Pac. (2d) 778, 793, to the effect that the test of whether an enterprise, such as a hospital, is charitable is its purpose, and that, if its purpose is to heal the sick and relieve the suffering without hope or purpose of gain from its operation, it is charitable. We held in the *Associated Hospital Case* that the gain or profit which destroys the charitable character of a corporation is that which inures to the benefit of its members and is not affected by the fact that the corporation's income may exceed its operating expenses."

While we recognize the authority of the *Duncan* and *Associated Hospital Service Cases, supra,* they must be distinguished in view of the fact that we adhere to the strict construction rule in tax exemption statute cases.

The issue in *Duncan* was tort liability of a hospital because of the negligence of an employee and an asserted defense of charitable immunity.

In *Associated Hospital Service* the issue was tax exemption of the real and personal property of a hospital service corporation operating on the Blue Cross Plan by virtue of sec. 182.032 (2) (a), Stats. At page 463 of the *Associated Hospital Service Case,* the court stated:

"The city further contends that the employment of the words of sub. (8) of sec. 182.032, Stats. 1955 and 1957, 'as provided in secs. 70.11, 71.01 (3), 72.04, and 72.75 to 72.81' must be interpreted as meaning that the tests of exemption, in so far as real and personal-property taxes are concerned, are those set forth in sec. 70.11. The learned trial court rejected such interpretation and so do we.

"There would be no purpose for the legislature to declare that a nonprofit hospital-service corporation is a charitable and benevolent corporation and tax exempt in sub. (8) of sec. 182.032, Stats. 1955 and 1957, if it already qualifies for exemption under sec. 70.11. On the other hand, if such corporation did not qualify for exemption under sec. 70.11, it also would be a meaningless gesture to declare in such sub. (8) that it was a charitable and benevolent corporation and tax exempt, if the ultimate tests of exemption are those prescribed by sec. 70.11."

The exemption statute relied upon, sec. 70.11 (4), provides: "Property owned and used exclusively by . . . benevolent associations . . . while such property is not used for profit . . . ." shall be exempt from property taxes.

Both parties, and the trial court in an exhaustive and helpful memorandum opinion, cite many Wisconsin and foreign jurisdiction cases that deal with the problem of tax exemption for the property of charitable or benevo-

lent associations. We will not attempt to cite or discuss most of these cases for the reason that ". . . neither a single test nor isolated answers to each of the questions posed . . . will automatically determine when a hospital [here a convalescent home] is a benevolent association. The facts of each case must be regarded as a whole and the substance of the scheme of operation as it exists must be examined." [1]

The statute clearly requires that the property must be used exclusively for benevolent purposes and not for profit.

The articles of incorporation, as amended, state that the appellant "is organized solely for charitable purposes."

The statute uses the word "benevolent" while the charter uses "charitable." The word "benevolent" in sub. (4), sec. 70.11 is no doubt synonymous with "charitable." [2]

There is no question that the property of the Home, considered apart from Bradford Terrace, as it is used and administered does fulfill the statutory requirements of an exclusive benevolent use without profit to its owners or directors. The care of the aged with their varying degrees of physical infirmities and senility, without insistence upon compensation equal to or greater than the cost of the services rendered, is universally recognized as charitable because of its humane consideration of others and its tendency to relieve the public of a burden. The Home as operated did not turn people out nor deny them admittance if they were unable to pay. The fact that there is an entrance fee and an assignment of all of one's property in return for life care does not destroy its charitable character. The financial contributions made by a substantial number of the residents have not equaled the cost of the service rendered. The officers and direc-

---

[1] *Prairie du Chien Sanitarium Co. v. Prairie du Chien* (1943), 242 Wis. 262, 265, 7 N. W. 2d 832.

[2] *Will of Roberts* (1927), 193 Wis. 415, 214 N. W. 347.

tors do not receive compensation for their services, not even reimbursement for their expenses. No profit inures to their benefit. The Home has consistently operated at a loss. The property and facilities of the Home have been exempt from property taxation and rightfully so under the statute.

Bradford Terrace, considered separately, is operated and managed in quite a different manner. True, the officers and directors are the same and they receive no compensation or reimbursement of expenses, and Bradford Terrace does provide the same type of service to elderly persons albeit the facilities and services are much more lavish.

Bradford Terrace operates at a profit. While a profit is an element that tends to negate a charitable purpose, it does not necessarily do so. If profits are not sizeable and, in turn, are utilized for additional charitable purposes, they do not destroy the tax exemption of the property.[3] The profits arise because of the rather substantial founders' fee. They do go to the retirement of debt and interest for the construction of the building. Profits used to pay for the acquisition of property to be devoted to a charitable purpose do not stand on exactly the same footing [4] as property used for charity; however, we do not condemn the founders' fee method as used in this instance for that reason.

It is the charitable aspects of the founders' fee agreement and the manner in which Bradford Terrace is operated that leads the minority of the court to pause.

Under the terms of the agreement, and in practice, applicants are not accepted unless and until they have paid the founders' fee of $8,000, $10,000 or $15,000, as the case may be, in full and have given reasonable as-

---

[3] See *Order of the Sisters of St. Joseph v. Plover* (1941), 239 Wis. 278, 1 N. W. 2d 173.

[4] See *Gymnastic Association v. Milwaukee* (1906), 129 Wis. 429, 109 N. W. 109.

surance of their ability to pay the monthly service charge. The size of the apartment and facilities included are not determined primarily by the needs of the resident but by the amount of the founders' fee he pays. Likewise, the monthly service charge and additional fees are not regulated entirely by his needs and not by his ability to pay but rather upon the services rendered. If he needs medical or special nursing care it is his financial responsibility. If he leaves before the end of three years only a proportionate part of the founders' fee will be repaid. If he does not pay his monthly service charge he can be evicted and liable to costs, including $1,000 liquidated damages. The residents of Bradford Terrace are certainly not elderly people, objects of charity, in the sense that the public or others come to their financial aid. As stated by the trial court, "It is difficult to believe that the residents who signed the businesslike contracts had any idea they were becoming parties to a charitable enterprise." The type of charitable or benevolent aid extended to the residents of Bradford Terrace and the financial obligations they assume are not substantially different than the services rendered or obligations assumed in a private commercially operated convalescent home which, of course, is not tax exempt.

We cannot refrain from comparing the resident of Bradford Terrace, affluent enough to pay the founders' fee in full before admission and with a portfolio attractive enough to assure his monthly payments, with the elderly owner of a modest home with assets or income hardly sufficient to sustain himself. The Bradford Terrace resident pays no taxes for his living facilities (nor does Bradford Terrace), while the owner of the modest home must.

The parties have cited cases from several foreign jurisdictions where tax exempt status of the property of convalescent homes being paid for on a founders' fee ba-

sis has been at issue.[5] In some instances the court found the property to be tax exempt, in others they did not. Aside from the point that the constitutions and exemption statutes of the various states differ, a salient observation is that in every case (except *Bozeman Deaconess Foundation v. Ford, supra*), where an exemption was approved, some of the residents were not required to pay the founders' fee in total or in part or were given other financial benefits based upon their needs. This is not so in this case of the residents of Bradford Terrace—they either pay the founders' fee and the service charges regardless of their financial abilities or they are not accepted or need not be retained.

Testimony of the officers indicates that they probably would not insist that a resident leave if he was unable to pay. The trouble with this argument is that the contract does not so provide and they have not been confronted by a resident who has not paid. Additional testimony was to the effect that after the note has been paid the expectation was that Bradford Terrace would be operated on the same basis as the Home. While there is no binding obligation that future operations be in accordance with this expectation, the significant point is that tax exemption statutes are to be applied as to the present use of the property and not as to how it might or will be used in the future.

In 2 Cooley, *Taxation* (4th ed.), pp. 1441, 1442, sec. 687, the rule is stated as follows:

[5] *Fredericka Home v. County of San Diego* (1950), 35 Cal. 2d 789, 221 Pac. 2d 68; *Fifield Manor v. County of Los Angeles* (1961), 188 Cal. App. 2d 1, 10 Cal. Rptr. 242; *Topeka Presbyterian Manor v. Board of County Commissioners* (1965), 195 Kan. 90, 402 Pac. 2d 802; *Methodist Homes, Inc. v. Tax Commission* (1961), 226 Or. 298, 360 Pac. 2d 293; *Friendsview Manor v. State Tax Commission* (1966), 247 Or. 94, 420 Pac. 2d 77; *Haines v. St. Petersburg Methodist Home, Inc.* (Fla. 1965), 173 So. 2d 176; *Presbyterian Homes v. City of Bradenton* (Fla. 1966), 190 So. 2d 771; *Bozeman Deaconess Foundation v. Ford* (Mont. 1968), 439 Pac. 2d 915.

"An intention to use property at some uncertain time in the future, for purposes which will render it exempt from taxation under the laws of the state, does not preclude its taxation before actually used for the purpose warranting an exemption. If the use determines the right to exemption, it is the present use and not the intended use in the future which governs."

We are of the opinion that the founders' fee method and service charge practices as presently used in Bradford Terrace do not constitute a charitable use of the property as contemplated by the legislature in sec. 70.11 (4), Stats.

The majority of the court agrees with the appellant that its whole operation is in reality only one; owned and controlled by the same corporation, with one board of directors and officers and with the same charitable objectives. But, it is only one of several wings of a large institution. Without again reciting the facts, we conclude that Bradford Terrace is being paid for in a different manner. Separate sets of books are kept; the nature of services rendered is more elaborate; the contracts of admission are different; and the duties, rights and obligations of Bradford Terrace and its residents are different. Bradford Terrace, although a wing of the Home, is readily identifiable as to its physical aspects, mode of operation, and property evaluation.

Bradford Terrace and the Home can and should be considered separately for tax exemption purposes. Sec. 70.11 (8), Stats., provides in part:

"TAXED IN PART. Where property for which exemption is sought pursuant to this section is used in part for exempt purposes and in part for pecuniary profit, then the same shall be assessed for taxation at such percentage of the full market value of said real and personal property as shall fairly measure and represent the extent of such use for pecuniary profit. . . ."

We are of the opinion that Bradford Terrace can be readily distinguished from the Home, both as to its

312

physical characteristics and its method of operation and administration and can be segregated for tax purposes. We would affirm the judgment of the trial court.

* Motion for rehearing denied, without costs, on April 1, 1969.