## Richmond

## MANASSAS LODGE NO. 1380, LOYAL ORDER OF MOOSE, INCORPORATED, ET AL. V. COUNTY OF PRINCE WILLIAM

September 1, 1977.

Record No. 760456.

Present: All the Justices.

*Edward E. Lane (Edward E. Lane & Associates, Incorporated,* on briefs), for plaintiffs in error.

*Ross G. Horton, Assistant County Attorney,* for defendant in error.

CARRICO, J., delivered the opinion of the Court.

This case involves an application for correction of erroneous assessments filed pursuant to Va. Code § 58-1145 by Manassas Lodge No. 1380, Loyal Order of Moose, Incorporated, and its trustees (hereinafter, the Lodge). In the application, the Lodge alleged that it was a charitable and benevolent association, that its real property was used exclusively for lodge purposes, and that the property was entitled to exemption from taxation. The Lodge prayed both for a declaration that the property was exempt from taxation and for exoneration from taxes previously assessed. After a hearing, the trial court denied the application, and the Lodge appeals.

The record shows that the land in question, located in Prince William County, is improved by a clubhouse erected in 1956 and enlarged in 1964. Prior to 1970, the property was not assessed for taxation; however, in that year, the County placed the property on the tax rolls and assessed taxes against it. The County has assessed the property each subsequent year.

First organized in 1952, the Lodge operates under an amended charter granted in 1969 by the State Corporation Commission. The amended charter states:

"The purpose or purposes for which the corporation is organized are: to unite its membership in the bonds of fraternal benevolence and charity; to assist their members

and their families in time of need; to render particular service to orphan children, aged members and their wives; and to further the mutual welfare of its members and their families. All the purposes set forth are to be carried out not for a profit, it being an eleemosynary corporation.

"....

"The purpose of the corporation is purely benevolent and exclusively charitable."

In denying the Lodge's application, the trial court ruled that, although the amended charter "set forth purposes which would permit tax exempt status," the Lodge had failed to prove it "operated for charitable and benevolent purposes." Thus, the question on appeal is whether the Lodge carried its burden of proving that its property should be exempted from taxation. In resolving this question, first we must establish the nature of the burden imposed upon the Lodge.

The Lodge contends it is entitled to have its claim to tax exemption determined according to a rule of liberal construction. On the other hand, the County contends a rule of strict construction is required. Obviously, the Lodge's burden of proof is lighter or heavier depending upon which rule is applied to its case. Pertinent to the choice between the two rules are sections of the constitutions of 1902 and 1971 and statutes enacted pursuant to the constitutional provisions.

The Constitution of 1902 was in effect when the Lodge was chartered as a charitable and benevolent association and its property was acquired and put to use. Under § 183(f) of that constitution and Va. Code § 58-12 enacted pursuant thereto, exemption from taxation was provided property belonging to charitable or benevolent associations and used exclusively for lodge purposes or meeting rooms. In construing these earlier constitutional and statutory provisions, we applied a rule of liberal construction. Under the liberal standard, exemption was the rule and taxation the exception. *Commonwealth* v. *Lynchburg Y.M.C.A.*, 115 Va. 745, 748, 80 S.E. 589, 590 (1914).

On July 1, 1971, Virginia's new constitution became effective. The advent of the new constitution signaled a different approach to tax exemption problems. As pertinent here, property used by

its owner for charitable or benevolent purposes may be exempted from taxation only by "a three-fourths vote of the members elected to each house of the General Assembly and subject to such restrictions and conditions as may be prescribed." Article X, Section 6(a)(6). Furthermore, under Article X, Section 6(f), "[e]xemptions of property from taxation as established or authorized hereby shall be strictly construed."

But, significantly, Article X, Section 6(f) contains a grandfather clause, in these words:

"[P]rovided, however, that all property exempt from taxation on the effective date of this section shall continue to be exempt. . . ."

In a comment upon this grandfather provision, the Commission on Constitutional Revision stated:

"A proviso has been added to [Article X, Section 6(f)] which is intended to protect existing exemptions from the strict construction requirement." *The Constitution of Virginia: Report of the Commission on Constitutional Revision* 306 (1969).

By the required three-fourths vote at its 1972 session, the General Assembly amended Va. Code § 58-12 to provide that certain classes of property exempt from taxation on July 1, 1971, "shall continue to be exempt . . . under the rules of statutory construction applicable to this section prior to July one, nineteen hundred seventy-one." Included within the classes so exempted is property belonging to charitable or benevolent associations and used exclusively for lodge purposes or meeting rooms.

█ From the foregoing situation, we draw these conclusions: Article X, Section 6(f) prescribes a rule of strict construction to apply *prospectively* to exemptions "established or authorized" by the new constitution; but the grandfather clause of Article X, Section 6(f), implemented by the 1972 amendment to Va. Code § 58-12, retains a rule of liberal construction to apply *retroactively* to determine whether certain property was exempt from taxation on July 1, 1971, and, therefore, should continue to be exempt. Accordingly, we believe that in the instant case the Lodge is entitled to the benefit of the liberal rule when we

determine whether it carried its burden of proving its property should be exempted from taxation.[1]

Viewing the Lodge's burden in light of the rule of liberal construction, we face, then, the questions whether, on July 1, 1971, the Lodge was a charitable or benevolent association and whether its property was used exclusively for lodge purposes.

■ We have said that the word "charitable," as used in tax exemption provisions, " 'should be given a fair and reasonable interpretation, and means intended for charity.' " An organization is charitable if it is " 'organized and conducted to perform some service of public good or welfare.' " *City of Richmond* v. *United Givers Fund,* 205 Va. 432, 436, 137 S.E.2d 876, 879 (1964). Although it does not appear that we have construed the word "benevolent," it too should receive a reasonable interpretation to give effect to its accepted meaning: "Philanthropic; humane; having a desire or purpose to do good to men; intended for the conferring of benefits, rather than for gain or profit." Black's Law Dictionary 201 (4th ed. 1951).

■ Applying the rule of liberal construction to property of charitable and benevolent associations, we have said that the word "exclusively," as used in tax exemption provisions, "has never been considered an absolute term." *City of Richmond* v. *Richmond Memorial Hospital,* 202 Va. 86, 91, 116 S.E.2d 79, 82 (1960). In determining whether the property of a charitable or benevolent association is exempt from taxation, "the controlling factor is the dominant purpose in the use of the property." *City of Richmond* v. *United Givers Fund,* 205 Va. at 438, 137 S.E.2d at 880.

With these principles in mind, we return to the evidence in the present case. The evidence submitted by the Lodge shows that it does not realize profit from its operations. Neither does it pay or promise to pay any money or other benefit to its members or other persons.

The Lodge is exempt under the Internal Revenue Code from payment of federal income taxes. It is exempt also as "a

[1]The County has conceded it is not dispositive that the Lodge's property had been placed on the tax rolls and assessed for taxation when the new constitution became effective July 1, 1971. It agrees with the Lodge, the County says, that *entitlement* "to tax exempt status at the time the Grandfather Clause took effect is the proper test to determine whether the clause applies to a particular entity."

non-profit, non-dividend paying corporation" from Virginia corporate income taxes.

The national Moose organization, of which the Lodge is a part, operates Moose Heart, "a complete child city . . . located on about 1,200 acres of land" in Illinois. Supported by the local Moose lodges, Moose Heart provides a home for approximately 400 orphaned and otherwise "needy" children of both members and non-members of the Moose organization. Moose Heart offers accredited educational opportunities from kindergarten through high school, and college scholarships are provided "for over half of the children that graduate" from the high school.

Witnesses for the Lodge testified that "raising funds to help Moose Heart" is the Lodge's "dominating purpose" and that the Lodge would not "be in existence without this charity." In addition to its normal support of Moose Heart, the Lodge donates to special projects; for example, it "contributed substantially" to a $60,000 fund to purchase "a new fire engine" for Moose Heart.

The Lodge, however, engages in other charitable and benevolent activities. These include financial contributions to a long list of charitable or benevolent organizations such as United Givers Fund and Red Cross. Further, the Lodge sponsors Little League athletic teams, provides financial support to programs for handicapped and underprivileged children, and renders aid to victims of disasters.

The clubhouse on the property in question is used for lodge meetings, social functions for members and guests, fund raising activities, and parties for underprivileged children. The grounds surrounding the clubhouse are used for "family day picnics," Little League athletic events, and recreational activities for underprivileged and other neighborhood children. The facilities are not rented or leased to outside organizations.

The Lodge finances its activities through membership dues, contributions from members and others, and proceeds derived from functions conducted by a social club operated within the lodge. Much of the controversy in the trial court focused upon this social club, with the County attempting to show that the club's functions were purely social in nature. The Lodge's witnesses insisted, however, that, although some of the club's functions might appear purely social, the club's purpose was to

promote "fraternalism and fellowship . . . to help gain revenue for . . . charitable organizations such as Moose Heart."

In any event, it was shown that the social club generated substantial funds through bingo games, dances, and dinners and that the proceeds were paid into the Lodge's general fund, from which lodge activities, including charitable programs, were financed. One of the Lodge's witnesses estimated that a "little" higher percentage of the Lodge's funds was used for charity than was used for "normal operations."

Against the Lodge's evidence, the County presented the testimony of only one witness, its supervisor of assessments, Arthur L. Shoemaker. He stated he had "examined the corporate books" of the Lodge and had prepared a summary of his findings, from which he testified. This summary, however, was not introduced into evidence and is not part of the record, so we are uninformed of its contents. Perhaps, if we had the summary before us, we could better understand what otherwise is confusing and inconclusive testimony.

Shoemaker stated that in the period February 1, 1971, to July 31, 1975, the "lodge itself" had total receipts of $223,889.83. Identified as "charity," he said, was the sum of $26,679.80 and as "entertainment," the sum of $45,064.74.

The "Moose club itself," Shoemaker said, had "total receipts of $348,766.88 to charity," although he "could not identify any items for charity." For "entertainment," he stated, the club expended $52,434.50, and under an item styled "turned over to the lodge treasurer," the books showed a figure of $42,089.

Shoemaker testified further that from "total combined receipts" of $572,666.71, $26,679.80, or 4.65% of "gross income," was contributed to charity while $97,499.28, or 17.02%, was expended for entertainment and recreation. Receipts from bingo for the period September, 1973, through August, 1975, the witness said, totaled $109,568.22.

In deciding the case below, the trial court commented that "expenditures by the lodge for charitable purposes are very small when compared to the expenditures for other purposes." Apparently, it was Shoemaker's calculations which prompted this observation. We do not believe, however, that Shoemaker's testimony justified this conclusion or was sufficient to overcome the prima facie case made by the Lodge.

In the first place, uncontradicted testimony of the Lodge's witnesses showed that receipts from bingo were used exclusively for charitable purposes.[2] If the sum of $109,568.22 received from bingo is added to the $26,679.80 figure Shoemaker actually credited the Lodge for charitable purposes, his percentage calculation of 4.65% for charity would be increased substantially. Further, if we use the $348,766.88 figure Shoemaker indicated may have been expended for charity, his percentage calculation would be increased dramatically. Finally, Shoemaker's calculation of entertainment and recreation expenditures provided no explanation of the nature of the activities financed thereby; he acknowledged he could not tell whether the figures included expenditures "for entertaining underprivileged children, or the handicap[ped], or anything like that." Yet, the Lodge's witnesses testified unequivocally that lodge funds were used for those charitable purposes.

In this particular area of the law, each case must be decided upon its own facts, and percentages are not necessarily controlling. *See St. Andrew's Association* v. *City of Richmond,* 203 Va. 630, 636-37, 125 S.E.2d 864, 868-69 (1962). In the present case, viewing the evidence as a whole in light of the rule of liberal construction, we believe the Lodge carried its burden of proving both that on July 1, 1971, it was a charitable or benevolent association and that charity or benevolence was the dominant purpose in the use of its property. We hold, therefore, that the Lodge was entitled to have the property exempted from taxation.

Accordingly, the judgment of the trial court will be reversed, and the case will be remanded for further proceedings not inconsistent with the views expressed in this opinion.

*Reversed and remanded.*

---

[2]Under Va. Code § 18.2-335 as it read at time of trial, receipts from bingo games conducted by religious, charitable, or community organizations were presumed to be used for charitable purposes.