ELECTRA ARMS APARTMENT AND MEDICAL CENTER FOUNDATION, INC., a Corporation of the State of Delaware, Plaintiff,

v.

The CITY OF WILMINGTON, a municipal Corporation of the State of Delaware, Defendant.

Supreme Court of Delaware.

May 7, 1969.

Charles K. Keil and William G. Campbell, of Bayard, Brill & Handelman, Wilmington, for plaintiff.

Stanley T. Czajkowski, Sp. Asst. Sol., Wilmington, for defendant.

WOLCOTT, Chief Justice, CAREY, Justice, and DUFFY, Chancellor, sitting.

CAREY, Justice.

This case comes to us on certification from the Superior Court. We accepted certification because certain practical needs of the parties required a prompt decision and because we were told that decision of the questions presented is awaited by certain other organizations which will be affected by our answer. The plaintiff, Electra Arms Apartment and Medical Center Foundation, Inc., (Electra) was incorporated in Delaware for the purpose of providing living quarters for elderly persons and handicapped persons in the City of Wilmington. The action instituted by Electra seeks a declaratory judgment as to whether it is exempt from taxation by the City. The questions of law presented are these:

(1) Should a corporation irrevocably dedicated to a non-profit charitable purpose and sponsored by a civic group maintaining a rental dwelling specifically designed for rental to the aged and handicapped, which is being rented primarily to that group, and which is running at a substantial loss, which loss is being absorbed by the sponsoring body, be granted exemption from property taxes as a corporation created for charitable purposes not held by way of investment pursuant to 9 Del.C. § 8103?

(2) If Electra is not exempt from property taxation and assessment pursuant to 9 Del.C. § 8103, is it instead exempt from taxation pursuant to 9 Del.C. § 8151 et seq., since it had substantially complied with this legislation?

T. 9 Del.C. § 8103 reads as follows:

"Property belonging to this State, or the United States, or any county of this State, or owned by any municipality of this State and held for public use, or any church or religious society, and not held by way of investment, or any college or school and used for educational or school purposes, or any corporation created for charitable purposes and not held by way of investment, except as otherwise provided, shall not be liable to taxation and assessment for public purposes by any county or other political subdivision of this State."

Electra was incorporated in 1965 under the sponsorship of the Electrical Workers of Delaware, Inc. and Local Union 313, International Brotherhood of Electrical Workers, an unincorporated association. A 15-story apartment building containing 234 apartments was erected by Electrical Workers of Delaware, Inc. at a cost of about $4,000,000.00. It was conveyed to Electra in June, 1965. Mortgage financing was supplied by a bank under a Federal Housing Administration guarantee in an amount equal to over 80% of the original cost. The mortgage contained a schedule of amortization payments covering both interest and principal, the last installment to be payable in 2005. The mortgage included an assignment of all rents, profits and income from the property to the mortgagee for the purpose of discharging the debt. Permission was given, however, to the mortgagor to collect those rents, profits and income so long as there was no default in payment of installments.

The charter of Electra contains several pertinent provisions, which we quote:

"THIRD: The objects and purposes of the corporation shall be:

"(a) to provide elderly persons and handicapped persons with housing facilities and services specially designed to meet their physical, social and psychological needs, and to promote their health, security, happiness and usefulness in longer living, the charges for such facilities and services to be predicated upon the provision, maintenance and operation thereof on a non-profit and charitable basis pursuant to Section 231 of the National Housing Act, as amended;

"(b) The Corporation is irrevocably dedicated to, and operated exclusively for, nonprofit and charitable purposes; and no part of the income or assets of the Corporation shall be distributed to, nor inure to the benefit of, any individual.

"TWELFTH: The By-Laws of the corporation may be adopted by the Directors at any regular meeting called for that purpose, so long as they are not inconsistent with the provisions of these Articles or the Regulatory Agreement between the corporation and the Federal Housing Commissioner, pursuant to Article II hereof.

"ARTICLE XII—*Amendment of By-Laws*

These by-laws may be altered, amended, changed, added to or repealed by a majority of the Directors present at any regular or special meeting so long as they are not inconsistent with the provisions of the Articles of Incorporation or the Regulatory Agreement between the corporation and the Federal Housing Commissioner, and provided that prior approval be secured from the Federal Housing Commissioner."

Article III of the by-laws of the corporation reads as follows:

"ARTICLE III: PURPOSES: Section 1. To provide elderly persons and handicapped persons with housing facilities and services specially designed to meet their physical, social and psychological needs, and to promote their health, security, happiness and usefulness in longer living, the charges for such facilities and services to be predicated upon the provision, maintenance and operation thereof on a nonprofit and charitable

basis pursuant to Section 231 of the National Housing Act, as amended.

"Section 2. The Corporation is irrevocably dedicated to and operated exclusively for, nonprofit and charitable purposes; and no part of the income or assets of the Corporation shall be distributed to, nor inure to the benefit of, any individual."

The City of Wilmington first assessed the property for tax purposes for the tax year beginning July 1, 1965, and continued to do so despite Electra's request for exemption. Those taxes have not been paid but the money therefor has been, by agreement, placed in an escrow account pending the outcome of the present suit. Electra conveyed the property to the Wilmington Housing Authority in February, 1968. That Authority has continued to operate the apartment in the same manner as did Electra.

The record shows that the apartment was designed and managed in such way as to carry out the purposes of Electra's charter and by-laws. In design, it contained many features to meet the particular needs of elderly or handicapped persons. Bathrooms and other places of possible danger were furnished with handrails to prevent falls. Laundry facilities were provided on each floor. There were special recreation areas, including card rooms, a television lounge, and exercise rooms. The living units had individual electric climate controls. There was a library in the building for the use of the tenants. There was provided 24-hour security guard coverage, as well as 24-hour switchboard operation, to make sure that the tenants would have assistance available at any time needed. On the staff, there was a full-time trained social worker to assist the tenants with their problems. A civic organization composed of residents was established; it met regularly and planned activities of various types for the elderly tenants in an effort to prevent "retirement shock." Arrangements were made whereby the tenants would check with one another early each day in order that any problems would be discovered promptly. A dining room and coffee shop were operated by Electra in the building, principally for the benefit of the tenants, as were a barber shop and a beauty salon. There was also a pharmacy, in which Electra owned 40% of the stock, where tenants could purchase medicine and other needs at a substantial discount. The rentals paid by tenants included all of these facilities, as well as the utilities.

In addition to the foregoing arrangements, Electra operated a Medical Center in the building, open daily except Sunday. It was staffed by four general practitioners, at least one of them being on duty at all times from 7:30 a. m. to 6:00 p. m. The Center also employed three registered nurses, certain laboratory technicians, and X-Ray and physiotherapy personnel. Medical specialists held clinics in the Center from time to time and were available by appointment for particular problems. In emergencies, a tenant would be treated in his own apartment. Complete medical records were kept for all tenants. The Center was particularly well equipped for treatment of the eyes and feet and for physiotherapy—types of assistance especially important for elderly people.

Rentals for the apartments were set at a figure apparently lower than those generally charged for ordinary apartments. At one time, the rentals were increased somewhat, but those tenants who could not afford to pay the increase were permitted to remain at the prior existing rate. Not only did Electra fail to make a profit, but instead, during the period (less than 3 years) of its operation, sustained a loss of approximately $500,000.00, which has been, or will be, made up by the sponsoring organizations. There was no discrimination of any nature in the selection of tenants, save that the operators tried to limit occupancy to persons 62 years of age or older. In the beginning, about 70 apartments were rented

to younger people simply because vacancies existed and Electra needed the income from those quarters. Later, however, 30 of those tenants were evicted upon the expiration of their leases. Of the older tenants, all but 8 were retired.

## I

■ The City first contends that Electra was not created and operated for a charitable purpose. This contention is not based upon any suggestion that relief of the aged or handicapped is not a recognized charitable purpose. Cf. In Re Tax Appeals of United Presbyterian Homes of Presbytery of Huntingdon, 428 Pa. 145, 236 A.2d 776. It is based on the suggestion that, after the life of the mortgage,* Electra's charter could be amended so as to eliminate the non-profit and charitable aspect, after which the corporation could be used for any purpose desired by the sponsors. The record contains nothing to suggest an intent to make any such change; certainly, the possibility of future change does not eliminate its charitable status during the time it was operating. In any event, the property itself has been sold at substantial loss; what Electra may do in the future has no bearing upon its past operations.

■ The City also seizes upon the fact that a certain number of apartments were leased to tenants under the age of 62, most of whom were gainfully employed. As we have pointed out, this was purely a temporary measure adopted only because those rooms were vacant and Electra needed the income to carry on the project. Many of those younger tenants were ousted upon the termination of their leases. We do not consider this partial departure from Electra's basic purpose, caused by the need of revenue, to be sufficient to exclude Electra from the category of a charitable enterprise.

## II

The City's main contention is that this property was held as an investment and therefore was not within the category of exempt properties under § 8103. On this question, it relies almost exclusively upon our recent holding in Kappa Alpha Educational Foundation, Inc. v. Holliday, Del. Sup., 226 A.2d 825 (1967), wherein we held that a foundation, which was in fact using most of the rentals received from a building to pay off its mortgage, was in fact using that property for investment. There the Foundation was created to provide various forms of assistance for male students in attendance at the University of Delaware. We were concerned, not with that general charitable purpose, but only with the narrow question of whether the building qualified as exempt property under the statute. The Foundation did nothing more with the property than rent it to the fraternity. Thus the corporation which actually owned the property and which sought the exemption used it to produce income which was then used almost entirely to reduce the mortgage and increase its equity in the property. So the property was "held by way of investment." A part of corporate income was used for scholarship purposes, but the amount so used was too small to affect the exemption issue.

We think that the present case differs from *Kappa Alpha* very significantly. Here the owner of the property, Electra, was actually using the property for the purpose of relieving the aged and handicapped. As we have pointed out, the building was specifically designed for that purpose and was so operated by the corporation which seeks the exemption. So it was "not held by way of investment." It was held to provide housing for the aged. The record justifies the finding that there was never an intent to use the property for the purpose of securing profit to its owner. It is this question of purpose which is the determinative issue. Mayor and Council v. Wilmington Monthly Meeting of Friends, West Street, 3 W.W.H. 180, 133 A. 88. Certainly, if we did not look beyond Electra's charter

---

* This change could not be made earlier because of a provision in the mortgage.

and by-laws, there could be no doubt on the point. If we look to what has actually happened, there would likewise be no question, were it not for the existence of the mortgage.

■ The City's contention here arises solely because of the amortization payments. It points out that, as such payments were made, Electra's equity was thereby increased, just as was true in the *Kappa Alpha* case. We do not think, however, that this factor alone requires a holding that the property was held for investment, when considered in the light of all the other facts. Electra had to borrow a great deal of its money in order to create the kind of place needed for those people whom it wanted to benefit. We have no doubt that some kind of amortization plan had to be arranged in order to secure those funds. We cannot adopt a rule which would bar charities from receiving the benefits of this statute simply because they must borrow money in order to exist.

We must remember, also, that the schedule of rentals was obviously designed to provide no benefit to Electra, but simply to enable it to "break even." As it turned out, of course, the rentals were inadequate for that purpose, even after they were raised. Any increase in Electra's equity in the building resulting from amortization payments was more than offset by its operating losses.

We are of the opinion that Electra is exempt from city taxation under T. 9 Del. C. § 8103. This conclusion makes it unnecessary to consider its alternative argument based upon T. 9 Del.C. §§ 8151–8156, enacted after the erection of Electra's building, which specifically provide for the exemption from taxation of non-profit housing for the elderly.

Question No. 1 will be answered in the affirmative. Question No. 2 will not be answered.

