633 So.2d 440 (1994)
HATTIESBURG AREA SENIOR SERVICES, INC. and Wesley Manor Retirement Community, Inc.
v.
LAMAR COUNTY, Mississippi, and the City of Hattiesburg, Mississippi.
No. 91-CA-181.
Supreme Court of Mississippi.
January 27, 1994.
Rehearing Denied March 24, 1994.
*441 Thomas D. Murry, Albert G. Delgadillo, Donna M. Barnes, Jeffry M. Cox, Mitchell, McNutt, Threadgill, Smith & Sams, Tupelo, Carey R. Varnado, Mongatue Pittman & Varnado, Hattiesburg, Richard D. Foxworth, Columbia, for appellant.
William E. Andrews, III, Purvis, Paul Richard Lambert, Hattiesburg, for appellee.
EN BANC.
BANKS, Justice, for the Court:
Here, we once again confront the question whether residential rental property owned by a not-for-profit corporation is tax exempt as belonging to a "charitable society ... and used exclusively for such society," as provided in Section 27-31-1(d), Mississippi Code 1972 Annotated (Supp. 1993). The fact that the corporate parties here were organized by a religious organization notwithstanding, we are unable to distinguish the property here in question from that found taxable in Better Living Services, Inc. v. Bolivar County, 587 So.2d 914 (Miss. 1991). We affirm the judgment of the chancellor holding that the property here in question is subject to taxation.

I.
Through the year 1987, appellant, Hattiesburg Area Senior Services, Inc. (hereinafter "HSS") enjoyed exemption from the assessment of ad valorem taxes. The exemption was based on § 27-31-1(d) of the Mississippi Code 1972 Annotated, which exempts property held by several types of organizations, namely charitable societies. Appellant, Wesley Manor Retirement Community, Inc. (hereinafter "WM"), opened its doors in October 1988. In 1988, the Lamar County Board of Supervisors placed the real and personal property held by HSS and WM on the assessment rolls for ad valorem taxation by Lamar County and the City of Hattiesburg. HSS paid a total of $12,627 in city and county ad valorem taxes in 1988; WM paid $1,265.
On November 7, 1988, HSS and WM filed a complaint against Lamar County and the City of Hattiesburg in the Lamar County Chancery Court. HSS and WM sought a declaratory judgment that they were exempt from ad valorem taxation, an injunction mandating a return of their 1988 tax payments, and a ban against future ad valorem taxation. HSS and WM were assessed 1989 ad valorem taxes in the amounts of $13,812.96 and $30,814.86, respectively. HSS and WM amended their original complaint to include relief from these taxes in their prayer for relief.
A trial was conducted on August 30 and 31, 1990. The parties made thirty-four stipulations of fact; ten stipulations were subject to objections from the County regarding relevancy. Following trial, the court issued a memorandum opinion declaring that plaintiffs had not met their burden of establishing that they were, in fact, "charitable societies" under § 27-31-1(d). The court also sustained each of the relevancy objections to some of plaintiffs' proffered stipulations and exhibits. A final judgment was issued dismissing plaintiffs' claims with prejudice and plaintiffs filed a timely notice of appeal to this Court.

II.
In 1962, the North Mississippi Annual Conference of the Methodist Church incorporated a board of trustees to develop dwelling facilities for older persons in North Mississippi. The organization was chartered as North Mississippi Home for the Aging (hereinafter "NMHA"). NMHA erected its first facility in 1967 in Tupelo. During the 1970's, NMHA developed several more institutions in Tupelo, Clarksdale, and Columbus. In the early 1980's, NMHA began to develop projects in south Mississippi at the request of the Methodist Church in that part of the State. Due to the expansion in its mission, NMHA reincorporated in 1982 under the *442 name of United Methodist Senior Services of Mississippi, Inc. ("UMSSM"). UMSSM opened the Hattiesburg Area Senior Services (HSS) facility in August 1986; it opened the Wesley Manor retirement facility in October 1988.
HSS operates 40 apartment units, and WM operates 60. For a cost of $695 per month, HSS and WM provide their residents with shelter, utilities, cable television, activities and programs, maintenance and upkeep on the premises, and one noon cafeteria meal per day. Additional meals are available at an extra cost. Delivery service is also provided at a nominal cost. All meals are approved by a geriatric dietitian and structured to achieve low sodium and low cholesterol goals. Accommodations are also made to meet special dietary needs, such as those held by individuals suffering from diabetes.
Additional services, such as housekeeping, transportation, and meal preparation help, are also available at an additional charge. On-premises medical staff is not provided by WM and HSS. That is a primary distinction between "continuum care" facilities, as these are called, and nursing homes. Furthermore, residents at WM and HSS are expected to tend to their own personal hygiene needs. Periodic health monitoring and screening is provided through a volunteer venture with the University of Southern Mississippi School of Nursing. As part of their training, nursing students occasionally visit the facilities to provide blood pressure checks and other routine diagnostic services.
The administrator for WM claimed that over 2,000 volunteer hours were logged at WM for the year 1989. The record is unclear on whether this figure is comprised substantially or almost completely of time spent by volunteers in conjunction with an Outreach Program operated from the premises of WM. That program provides in-home services to individuals who live independently in private homes in Lamar County and the surrounding area. The services provided include homemaker services, home health aid services, shopping services, and limited emergency transportation. The appellant corporations HSS and WM do not actually operate or facilitate the Outreach Program, though it is run from the WM premises.[1]
The operating budgets at HSS and WM are expected to be funded entirely through the fees charged the residents at those institutions. According to the accountant for WM, HSS, and UMSSM, the Hattiesburg facilities have nevertheless operated at a loss for each of their years of existence. The audited financial statements presented by Lamar County and the City of Hattiesburg show that HSS did have a net income of approximately $47,000 for the year 1988.[2] The accountant for appellants also testified that the Hattiesburg facilities often experience cash flow shortages. When such shortages occur, interfund transfers are made from entities under the UMSSM umbrella to make up the difference. Those transfers are treated as debts on the books of the transferee and assets on the books of the transferor. They are expected to be paid back, at least in part.[3]
The agreement between HSS and WM provides that individuals who do not pay their rent will be evicted. The President of UMSSM testified that no person had ever been evicted from HSS or WM for inability to pay his rent, however. Federal rent subsidies are available through the Department of Housing and Urban Development to residents who meet certain designated maximum income levels. For instance, "[p]ersons who qualify for residency in [HSS] with gross annual income of less [than] $9,300 for a single individual or $10,650 for a couple are expected to personally pay only 30% of their *443 adjusted monthly income for the rent portion of the monthly charge." "Sunday Fund" assistance has been available for residents unable to make their rent payments. It was stipulated that "The Senior Services Sunday Fund" is a fund made up of contributions from individuals, primarily from within the State of Mississippi, but also including other friends, supporters and benefactors of UMSSM and its related corporations. Contributions are received on annual basis and payments are made to or on behalf of residents of various facilities, including those of HSS and Wesley, who are in need of assistance to meet their monthly expenses. The administrator of WM testified that no resident of his institution who had applied for Sunday Fund assistance had ever been denied. Through June 30, 1990, Sunday Fund assistance has been provided to HSS and Wesley residents as follows: 1987) HSS residents received a total of $500, and WM residents received a total of $0[4]; 1988) HSS residents received a total of $653, and WM residents received a total of $100; 1989) HSS residents received a total of $600 and WM residents received a total of $2,640; 1990) HSS residents received a total of $250 and WM residents received a total of $2,245.
The only source of non-debt revenue for HSS and WM outside of rent payments by residents is gift contributions from the public. From the inceptions of the institutions through the first half of 1990, contributions designated for use by HSS and Wesley totaled $174,000. That sum was given and used to help defray the construction costs of HSS and WM, which amounted to $1.68 million and $3.03 million respectively.
UMSSM is the sole member of HSS and Wesley. No dividends or other similar distributions of earnings or profits are made by HSS or WM. The charters for WM and HSS provide that upon dissolution, the organization's assets must be distributed to another 501(c)(3) organization or charitable group.
WM and HSS are recognized as exempt from federal income taxation under § 501(c)(3) of the Internal Revenue Code which also enables them to receive tax exempt contributions from the public. They are also recognized as exempt from state income taxation under § 27-7-29(3) of the Mississippi Code, which excludes charitable organizations.
HSS enjoyed an exemption from ad valorem taxes in 1986 and 1987 based on § 27-31-1(d) of the Mississippi Code 1972 Annotated. WM was not yet in existence at that time. WM opened in October 1988, and, in that year, the Lamar County Board of Supervisors decided to place both WM and HSS on the assessment rolls for ad valorem taxes. Those rolls were effective for 1988 and 1989. The City of Hattiesburg is bound by the assessment rolls fixed by the Board of Supervisors of Lamar County. Therefore, HSS and WM were assessed ad valorem taxes for 1988 and 1989 by both Lamar County and the City of Hattiesburg.

III.
In this appeal WM and HSS contest the ultimate conclusion of the court below as well as its evidentiary ruling with regard to certain of the stipulated facts and exhibits.
Section 27-31-1(d) of the Mississippi Code provides an exemption from ad valorem taxation for "[d] All property, real or personal, belonging to ... any charitable society ... and used exclusively for such society or association and not for profit." Miss. Code 1972 Ann. § 27-31-1(d) (Supp. 1993). For an organization to qualify for a "charitable" exemption under § 27-31-1(d), it must thus be evident that: 1) the organization meets the definition of "charitable" as contemplated by the statute; 2) the property for which the exemption is sought to be claimed is "used exclusively for such society or association" and must not exceed the amount of land permitted to be owned under Section 79-11-33, Mississippi Code 1972 Annotated; and 3) the property is not used "for profit." See Miss. Code 1972 Ann. § 27-31-1(d) (Supp. 1993).
This Court has said regarding the construction of such statutes:

*444 Under our general rule, statutes exempting property from taxation are to be strictly construed in favor or the taxing authority and against the exemption. Accordingly, one seeking the benefit of the exemption must clearly show or demonstrate that he is within the letter of the exemption, all reasonable doubts generally being resolved against the exemption.
Local Union No. 845 v. Lee County Board of Supervisors, 369 So.2d 497, 499 (Miss. 1979). Review of whether appellants are entitled to an exemption under § 27-31-1(d) presents a question of law, as it necessarily turns on both the construction of the statutory language and application of it to the facts of the instant case. See generally United States v. McConney, 728 F.2d 1195 (9th Cir.1984); See also Pullman-Standard v. Swint, 456 U.S. 273, 289-90 n. 19, 102 S.Ct. 1781, 1790-91 n. 19, 72 L.Ed.2d 66 (1982). This Court reviews questions of law de novo. See In the Matter of the Estate of Mason v. Fort, 616 So.2d 322, 322 (Miss. 1993); Cooper v. Crabb, 587 So.2d 236, 239 (Miss. 1991); Holliman v. Charles L. Cherry & Associates, 569 So.2d 1139, 1147 (Miss. 1990).
In the case at bar, the chancery court determined in its memorandum opinion that appellants, HSS and WM, failed at trial to carry their burden regarding each of the three prerequisites set forth in § 27-31-1(d). Appellants contend, however, that despite the language of the chancery court's memorandum opinion, they were in actuality denied exempt status solely because they charge rents for the benefits they provide to their residents. This fact, they argue, led the chancery court to erroneously conclude that they were not "charitable" entities in the sense contemplated by § 27-31-1(d). Appellees respond that while HSS and WM were incorporated as non-profit corporations, they do not fall within the statute's intended parameters for "charitable" organizations. Appellees argue that the operations conducted by HSS and WM are in actuality business ventures that compete with the private sector. Moreover, they contend that each of the three § 27-31-1(d) prerequisites operate to exclude appellants from exempt status.
The focal point of the parties' arguments on appeal is whether HSS and WM had demonstrated themselves to be "charitable societies." The other two prongs of the § 27-31-1(d) test must be considered as well, however, because failure to satisfy either of the three requirements demands a conclusion that HSS and WM do not qualify for an exemption under § 27-31-1(d).
Starting first with the exclusive use requirement, the chancery court concluded that that prong was not satisfied based on the following rationale:
The Legislative language seems to this Court to infer strongly that the "use" is to be made by persons who are either members of, or are persons of a class who make up, the "society". It does not appear to this Court that the Legislative language is so broad as to contemplate inclusion therein of corporate entities such as the Plaintiffs here, and that despite the admitted fact that their motives are of the highest order and that only commendation can come to them, and their spouses, for the wonderful facilities that they have created and the laudable purposes which they serve. The Legislative intent must be gathered from the plain and ordinary language used, and affording to the words their ordinary meaning.
The chancellor made no reference to any particular passage or phrase in § 27-31-1(d) that compels an inference that the Legislature did not intend to allow corporate entities to receive exemptions under this part of the statute.
We note, however, as did the chancellor, that in a subsequent clause in Section 27-31-1(d) referring to other tax exempt usages the terms "individual, institution or corporation" are used to refer to ownership. More importantly, elsewhere in the statute, specific exemptions are granted for specific usages which may be conducted by owners who are religious or charitable societies. These include colleges, universities and hospitals. Miss. Code 1972 Ann. § 27-31-1(d) and (f) (Supp. 1993).[5] Finally, the reference to Miss. *445 Code 1972 Ann. § 79-11-33, dealing specifically with religious societies, suggests strongly that the tax exempt property of all of the societies mentioned in the first clause of § 27-31-1(d) is limited to the specific usages enumerated there. Housing for the elderly is not one of the activities mentioned. Miss. Code 1972 Ann. § 79-11-33.
While the fact that a religious or charitable society chooses to act in the corporate form may not disqualify it for the exemption[6], it seems clear from the general statutory scheme that the general exemption provided in the first clause of § 27-31-1(d) is limited to property used for the activities of the society itself. The amount of property is limited by the usages enumerated in § 79-11-33. The decision of the chancellor as to the first prong was correct.
The chancery court also said HSS and WM failed to meet the "not for profit" prong of the § 27-31-1(d) test. The court explained:

It is not disputed that Plaintiffs realize no profit from the operations they conduct in the sense of profit accruing to owners in the usual business operation. However, it is neither disputed that[:]
 all the tenants of both facilities pay rent, none being received to occupancy on a zero rental basis' [sic];
 budgetary planning is done with the view and purpose of rental income meeting the total expenses of the operations;
 budget proposals submitted to HUD include amounts under the category of "taxes";
 substantial salaries are paid to persons employed in the operations of the sponsoring organizations and the persons managing and operating the two facilities, HSS and Wesley, are fully paid persons and not donators of time and services;
 profit and loss statements have reflected, for normal bookkeeping procedures, both profit and loss has been shown for differing periods, and that in those statements the usual accounting procedures uses of depreciation have been utilized, contributing substantially to losses where reported, though such losses are not reflective of actual cash loss as such.

[italics added; underline included in original]. The chancery court apparently proceeded on the view that net gain is synonymous with profit. The court correctly observed that HSS and WM charge fees at rates that are designed to cover the costs of providing the services they render. The record also bears out that, on at least one occasion, HSS has operated solely from those rents without incurring a net loss at the end of the year. The court indicated, however, that the operations conducted by HSS and WM do not evince an intent to create a long-term benefit for itself or any individual equity-holders. To the contrary, the policy of the Hattiesburg facilities is to reinvest any net gain that exists at the end of the year into the operations of the facilities.
It appears that what the chancellor found problematic was not the actual derivation of a profit, as it is traditionally conceived. Instead, the chancellor's analysis seems to reflect a deeper concern with an apparent lack of gratuitousness that emanates from the HSS and WM operations. That is, the court sought to differentiate whether these corporations *446 were meeting a need through charity or through a non-charitable, though laudable, economic activity.
That concern is one that is frequently addressed while considering whether an organization is in fact "charitable" in nature. See Better Living Services, Inc. v. Bolivar County, 587 So.2d 914 (Miss. 1991); Fredericka Home for the Aged v. San Diego Co., 35 Cal.2d 789, 221 P.2d 68 (1950); United Church of Christ v. West Hartford, 206 Conn. 711, 539 A.2d 573 (1988); Clark v. Marian Park, Inc., 80 Ill. App.3d 1010, 36 Ill.Dec. 241, 400 N.E.2d 661 (1981), Richards v. Iowa Department of Revenue, 414 N.W.2d 344 (Ia. 1987); Assembly Homes, Inc. v. Yellow Medicine Co., 273 Minn. 197, 140 N.W.2d 336 (1966); Appeal of Lutheran Home at Topton, 100 Pa.Cmwlth. 244, 515 A.2d 59 (1986); Challenge Homes, Inc. v. Co. of Lubbock, 474 S.W.2d 746 (Tex. 1971).
In concluding that HSS and WM were not operating as "charitable societies" within the meaning of § 27-31-1(d), the chancery court relied chiefly on the analytical framework exployed by the Second District Illinois Court of Appeals in the case of Clark v. Marian Park, Inc., 80 Ill. App.3d 1010, 36 Ill.Dec. 241, 400 N.E.2d 661 (1981). In that case, the Illinois Court of Appeals for the Second District ruled on whether a housing facility for the elderly qualified for an ad valorem tax exemption as a "charitable organization" under the applicable Illinois statute. 36 Ill.Dec. at 243, 400 N.E.2d at 663. In passing on the question, the court said:
For an organization to be considered charitable for purposes of obtaining the exemption, the following six factors must be present:
(1) the benefits derived are for an indefinite number of persons;
(2) the organization has no capital, capital stock or shareholders, and does not profit from the enterprise;
(3) funds are derived mainly from private and public charity, and the funds are held in trust for the objects and purposes expressed in the charter;
(4) the charity is dispensed to all who need and apply for it;
(5) no obstacles appear to be placed in the way of those seeking the benefits; and
(6) the exclusive (primary) use of the property is for charitable purposes.
Id. 36 Ill.Dec. at 244, 400 N.E.2d at 664. Applying that framework, the Lamar County Chancery Court drew the following conclusions in the case sub judice:
The Court recognizes that HSS and Wesley may be said fairly to meet some of the stated factors, but the evidentiary record is quite clear and convincing that their funds are not derived mainly, or even substantially, from private or public charity  all the credible evidence conclusively shows that they mainly rely upon rental receipts to meet all their expenses, including repayment of principal and interest on the quite substantial loans procured to improve their properties. Equally clear to this Court, the "charity" is not dispensed to all who need and apply for it  it is dispensed to those who apply and meet the financial criteria to either (a) qualified (sic) for HUD rent subsidy for residence in HSS, or (b) qualify from their own resources to make the rental payments for residence in Wesley. It is crystal clear that no one lives in either facility without payment of rent by him or her, either in part and with HUD subsidy, or in full by him or her. Indeed, HSS and Wesley budgets in evidence clearly reflect that rents are fixed according to projections of income needed to meet all the expenses of the corporations and without any reliance upon contributions. (emphasis in original).
In arguing that the court erred in its conclusion on this prong, appellants contend the chancery court attributed too much significance to the fact that appellants charged rents for the services they provided to their tenants. They contend they were denied exempt status because they do not provide free lodging and services for their residents. Today, a clear majority of the jurisdictions across this country adhere to the rule that an institution or organization does not lose its tax exempt status merely because it charges fees for the benefits it provides, if the funds so derived are devoted to the altruistic purposes for which the entity was organized. *447 See Commissioner v. Battle Creek, Inc., 126 F.2d 405 (5th Cir.1942); Matanuska-Susitna Borough v. King's Lake Camp, 439 P.2d 441 (Alaska 1968); Hot Springs School Dist. v. Sisters of Mercy, 84 Ark. 497, 106 S.W. 954 (1907); Santa Catalina Island Conservancy v. County of Los Angeles, 126 Cal. App.3d 221, 178 Cal. Rptr. 708 (2nd Dist. 1981); Camp Isabella Freedman v. Canaan, 147 Conn. 510, 162 A.2d 700 (1960); Electra Arms Apartment & Medical Center Foundation, Inc. v. Wilmington, 254 A.2d 244 (Del.Sup. 1969); Fellowship Foundation, Inc. v. Paul, 86 So.2d 808 (Fla. 1956); Elder v. Henrietta Egleston Hospital for Children, 205 Ga. 489, 53 S.E.2d 751 (1949); Methodist Old Peoples Home v. Korzen, 39 Ill.2d 149, 233 N.E.2d 537 (1968); State Board of Tax Commissioners v. Methodist Home for Aged, 143 Ind. App. 419, 241 N.E.2d 84 (1968); Topeka Presbyterian Manor, Inc. v. Board of County Commissioners, 195 Kan. 90, 402 P.2d 802 (1965); Preachers Aid Soc. v. Jacobs, 235 Ky. 790, 32 S.W.2d 343 (1930); State ex rel. United Seaman's Service, Inc. v. New Orleans, 209 La. 797, 25 So.2d 596 (1946); Green Acre Baha'i Institute v. Eliot, 150 Me. 350, 110 A.2d 581 (1954); Redemptorists v. County Commissioners of Howard County, 50 Md. 449 (1879); Children's Hospital Medical Center v. Board of Assessors, 353 Mass. 35, 227 N.E.2d 908 (1967); Retirement Homes of Detroit Annual Conference of the United Methodist Church, Inc. v. Sylvan Township, 92 Mich. App. 560, 285 N.W.2d 375 (1979); Assembly Homes, Inc. v. Yellow Medicine County, 273 Minn. 197, 140 N.W.2d 336 (1966); Jewish Community Centers Asso. v. State Tax Com., 520 S.W.2d 23 (Mo. 1975); Bozeman Deaconess Foundation v. Ford, 151 Mont. 143, 439 P.2d 915 (1968); Evangelical Lutheran Good Samaritan Soc. v. Gage, 181 Neb. 831, 151 N.W.2d 446 (1967); Portsmouth Historical Soc. v. Portsmouth, 89 N.H. 283, 197 A. 712 (1938); Paterson Rescue Mission v. High, 64 N.J.L. 116, 44 A. 974 (1899); Belle Harbor Home of Sages, Inc. v. Tishelman, 100 Misc.2d 911, 420 N.Y.S.2d 343 (1979); Goldman v. Friars Club, Inc., 48 O.O. 147, 158 Ohio St. 185, 107 N.E.2d 518 (1952); Tulsa County v. St. John's Hospital, 200 Okla. 176, 191 P.2d 983 (1948); Friendsview Manor v. State Tax Com., 247 Or. 94, 420 P.2d 77 (1966); Lutheran Hospital Asso. v. Baker, 40 S.D. 226, 167 N.W. 148 (1918); Baptist Hospital v. Nashville, 156 Tenn. 589, 3 S.W.2d 1059 (1928); Santa Rosa Infirmary v. San Antonio, 259 S.W. 926 (Tex.Com.App. 1924); Brattleboro Retreat v. Brattleboro, 106 Vt. 228, 173 A. 209 (1934); Board of Supervisors v. Medical Group Foundation, Inc., 204 Va. 807, 134 S.E.2d 258 (1964); Re Rust's Estate, 168 Wash. 344, 12 P.2d 396 (1932); Reynolds Memorial Hospital v. Marshall County Court, 78 W. Va. 685, 90 S.E. 238 (1916); Milwaukee Protestant Home v. Milwaukee, 41 Wis.2d 284, 164 N.W.2d 289 (1969).
Many jurisdictions have drawn lines of demarcation, however, to separate instances where the fees charged by such institutions are commensurate to, or exceed, the magnitude of the benefits they provide. See Fredericka Home for the Aged v. San Diego Co., 35 Cal.2d 789, 221 P.2d 68 (1950); United Church of Christ v. West Hartford, 206 Conn. 711, 720-24, 539 A.2d 573, 578 (1988); Clark v. Marian Park, Inc., supra; Richards v. Iowa Department of Revenue, 414 N.W.2d 344 (Ia. 1987); Assembly Homes, Inc. v. Yellow Medicine Co., supra; Appeal of Lutheran Home at Topton, 100 Pa.Cmwlth. 244, 515 A.2d 59, 68 (1986); Challenge Homes, Inc. v. Co. of Lubbock, 474 S.W.2d 746, 749 (Tex. 1971); But see Michigan Baptist Homes & Development v. City of Ann Arbor, 396 Mich. 660, 242 N.W.2d 749, 754 (1976); Franciscan Tertiary Province of Missouri, Inc. v. State Tax Commission, 566 S.W.2d 213, 226 (Mo. 1978).
In the instant case, it is readily apparent from the chancery court's opinion that the court did not base its conclusion on this prong solely on the fact that HSS and WM charge some fees for their services. The court was expressly concerned with the facts that: 1) HSS and WM charged fees at a level that was intended to equal the costs of providing the services; and 2) HSS and WM conducted a screening process to assure itself that the residents it accepted had personal funds or access to government funds sufficient to pay in full the rents charged by HSS and WM. The clear import of the court's notation of these two facts is that the court *448 saw a lack of gratuitousness in the provision of services at HSS and WM, and the court found that circumstance inconsistent with the tenor of the exemption statute in question.
We recently addressed the link between gratuitous services and exempt status under § 27-31-1(d) in Better Living Services, Inc. v. Bolivar County, 587 So.2d 914 (Miss. 1991). In Better Living Services, a corporation which operated federally-subsidized apartments for the elderly, destitute, handicapped, and disabled claimed that it deserved to be exempt from property taxes under § 27-31-1(d). The Court ultimately denied the exemption. 587 So.2d at 917. In doing so, it noted, "We see no reason why an institution, merely because it caters to the needs of the aged and infirm, should be exempt from taxation if someone other than that institution is furnishing the cost of the care and maintenance provided by the institution." Id.; quoting Oea Senior Citizens, Inc. v. Douglas County, 186 Neb. 593, 185 N.W.2d 464, 470 (1971).
When we transport that logic to the instant case, we see that HSS and WM should not be granted exemptions from ad valorem taxes under § 27-31-1(d). The fees charged by HSS and WM are designed to and do substantially cover all the operating expenses of those facilities, and the application process is designed to deliver a body of residents that can pay those fees. Additionally, the HSS and WM lease agreements allow HSS and WM to evict residents who demonstrate an inability to pay the prescribed fees. Given these circumstances, we find no manifest error in the chancellor's determination that the property in question was not "used exclusively for a charitable society and not for profit" within the meaning of the statute and, consequently, that no property tax exemption was available under § 27-31-1(d).

IV. Exclusion of Stipulations and Exhibits

In accordance with objections posed by the HSS and WM at trial, the chancery court excluded proffered stipulations of fact 11, 12, 14, 15, 28, and 32 and plaintiffs' exhibits 12 and 14 on the ground that they were not relevant. HSS and WM contend that the chancery court erred in this determination. The excluded proffers for stipulation stated as follows:
11. The Attorney General of the State of Mississippi by letter dated January 14, 1965, has issued an opinion that the property of UMSSM (successor in corporate name to North Mississippi Methodist Home for the Aging, Inc.) is exempt from ad valorem taxation.
12. The aforesaid Attorney General's opinion resulted from a request submitted on behalf of Lee County, Mississippi, concerning the ad valorem taxation of property owned in Lee County by North Mississippi Methodist Home for the Aging, Inc. (predecessor in corporate name to UMSSM).
14. HSS and Wesley are exempt from corporate income taxation pursuant to section 27-7-29(a)(3), Miss. Code Ann. (1972), as amended.
15. HSS and Wesley are recognized by the Mississippi State Tax Commission as exempt from sales tax on their purchases of tangible personal property and taxable services.
* * * * * *
28. The property of UMSSM and each of its affiliated corporations is treated as exempt from ad valorem taxation in every other county in Mississippi in which situated: Lee, Coahoma, Greene, Lowndes, Lauderdale, and Harrison.
* * * * * *
32. From 1965 through the first half of 1990, the UMSSM family of retirement facilities has received total contributions in the amount of $5,866,000, which amount includes contributions made to HSS, Wesley, and to the UMSSM Sunday Fund.
Plaintiffs' Exhibit 12 is a letter dated January 14, 1965, from the Mississippi Attorney General's office regarding the tax exempt status of North Mississippi Methodist Home for the Aging, Inc. Plaintiffs' Exhibit 14 is a letter dated January 10, 1983, from the Mississippi State Tax Commission to UMSSM recognizing UMSSM as exempt from sales tax on purchases of tangible property.
*449 This Court has espoused the general rule that "[r]elevancy and admissibility of evidence are largely within the discretion of the trial court and this Court will reverse only where that discretion has been abused." Hentz v. State, 542 So.2d 914, 917 (Miss. 1989); Burt v. State, 493 So.2d 1325, 1326 (Miss. 1986); Carter v. State, 310 So.2d 271, 273 (Miss. 1975). In addition, Rule 103(a) of the Mississippi Rules of Evidence provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected ..." Miss.R.Evid. 103(a). In ruling on the relevancy of the excluded stipulations, the chancery court noted, "they deal primarily with the manner in which other governmental agencies than those here involved have dealt with the tax status of Plaintiffs and/or how the Defendants have dealt with other entities than these Plaintiffs." That characterization is obviously a correct one. It also clearly applies to the two exhibits whose exclusion Appellants seek to contest. Additionally, the exhibits are letters which do not even pertain to the tax exempt status of HSS and WM. They relate to the status of North Mississippi Methodist Home for the Aging, Inc. and UMSSM. Given these circumstances, it can hardly be said that the chancellor abused his discretion in declaring the subject items irrelevant.

CONCLUSION
For the foregoing reasons, the judgment of the Lamar County Chancery Court is affirmed.
AFFIRMED.
HAWKINS, C.J., and SULLIVAN, J., concur.
SMITH, J., dissents with separate written opinion, joined by McRAE and JAMES L. ROBERTS, Jr., JJ.
DAN M. LEE and PRATHER, P.JJ., and PITTMAN, J., not participating.
SMITH, Justice, dissenting:
The majority claims to be transporting the logic from Better Living Services, Inc. v. Bolivar County, 587 So.2d 914 (Miss. 1991), to the instant case, holding that Hattiesburg Area Senior Services, Inc. (HSS) and Wesley Manor Retirement Community, Inc. (WM) should not be granted exemptions from ad valorem taxes under Miss. Code Ann. § 27-31-1(d). The majority's logic is supported by it's acceptance of the chancellor's findings that there was a "lack of gratuitousness" in the provision of services at HSS and WM, and that circumstance was inconsistent with the tenor of the exemption statute in question. The majority expresses concern, as did the chancellor, about the fact that HSS and WM charge fees at a level that was intended to equal the costs of providing the services and used a screening process to assure itself that accepted residents had personal funds or access to government funds sufficient to pay the full fees. The majority expresses concern that the lease agreements allow HSS and WM to evict residents who demonstrate an inability to pay the prescribed fees. The majority holds, as it did in Better Living:
We see no reason why an institution, merely because it caters to the needs of the aged and infirm, should be exempt from taxation if someone other than that institution is furnishing the cost of the care and maintenance provided by the institution.
Id., quoting Oea Senior Citizens, Inc. v. Douglas County, 186 Neb. 593, 185 N.W.2d 464, 470 (1971).
A distinguishing factor in the case sub judice, also not present in Better Living, is that HSS and WM are not proprietary or privately owned corporations operating apartment housing competing with other apartment complexes in the private sector, but rather are a part of a much larger Christian cooperative ministry providing services to elderly citizens statewide. This ministry, the United Methodist Church of Mississippi and its United Methodist Senior Services of Mississippi, Inc. (UMSSM) operate many similar facilities identical to these two throughout the state. There is no suggestion that HSS and WM are in competition with any other entity operating in the Hattiesburg and Lamar County area. Indeed, the Lamar County Board of Supervisors, by resolution, supported the initial construction of WM, citing inter alia, that Lamar County "lacks *450 adequate residential facilities for its aged and elderly citizens."
Better Living cited the early case of Smith v. Myatt, 146 Miss. 388, 111 So. 590 (1927) for support of denial of a tax exemption. In Smith, the subject property, owned by King's Daughters Hospital was not being used, and the denial of the tax exemption was upheld for that very simple reason. In Better Living, the Court found that in Smith, the tax exempt organization had been found to have entered "into a proprietary function in competition with private enterprise." In the case at bar, the same cannot be said for the operation of the HSS and WM facilities. The Better Living Services organization had no such affiliation, but was clearly a proprietary business in direct competition with the private sector.
There is another factor distinguishing HHS and WM from Better Living. No person has ever been evicted from these retirement facilities of HSS or WM, or denied assistance because of their inability to pay fees. The cost of living at WM was less than half of the cost of a nursing home. This fact is ignored by the majority opinion which only concerns itself with the specific contract language, which allowed for eviction for nonpayment of fees.
More important is the fact that, except for interfund transfers from the United Methodist Church family, and particularly UMSSM, these two facilities would not be able to render the services they have provided. Over 5,000 contributors, including 400 churches, make contributions to UMSSM. On June 30, 1990, the intercorporate debt of the two facilities HSS and WM was $109,743. The fees charged by WM were not sufficient to cover all the operating expenses of the facilities. Cash flow shortages have plagued the corporations for most, if not all, their years of operation. In 1989 alone, UMSSM operated at a $149,000 loss statewide, of which $100,318 was attributable to the homemaker services operated out of the WM facilities. According to the record, without these interfund transfers, HSS and WM would have to either close or unable to provide the services currently delivered to their residents.
The Mississippi statutory provision requires first, that all property for which the exemption is sought must belong to a charitable society. Second, the property must be used exclusively for the charitable society. Third, the property should not be used for profit. However, the statute provides no definition of "charitable society."
Black's Law Dictionary, 6th Edition, defines "charitable" as:
Having the character or purpose of a charity. The word "charitable", in a legal sense includes every gift for a general public use, to be applied consistent with existing laws, for benefit or an indefinite number of persons, and designed to benefit them from an educational, religious, moral, physical or social standpoint... .
In the case sub judice, HSS, WM, and UMSSM have been found to be "charitable" by every national, state and county reviewing entity, except Lamar County and the City of Hattiesburg. The Attorney General of Mississippi and six county boards of supervisors have determined that homes for the aging owned by UMSSM operating in a substantially similar manner to HSS and WM were "charitable" under § 27-31-1(d), yet the chancellor would not even consider this as evidence, holding this to be irrelevant.
The charitable nature of the institution is not destroyed by the fact that the residents pay fees according to their ability. Central Board on Care of Jewish Aged, Inc. v. Henson, 120 Ga. App. 627, 171 S.E.2d 747, 750 (1969).
Because of the general rule disfavoring tax exemption, it is important that cases dealing with tax exempt status be dealt with on a case by case basis. However, it is also the rule that exemptions in favor of charitable organizations should be "fairly, liberally, and reasonably construed, with an eye to the spirit of the laws, to the end of arriving at the intention of the legislature, and in harmony with the intent of the state to encourage charity." 84 C.J.S. Taxation, § 282 at 535 (1954) (footnotes omitted) (emphasis added).
A case involving a factual situation strikingly similar to the case sub judice is Yorgason v. County Board of Equalization, 714 *451 P.2d 653 (Utah 1986). In Yorgason, a non-profit corporation related to the Episcopal Church, organized "exclusively for charitable purposes," was operating a 98 unit residential facility with the specific purpose of promoting the welfare of needy elderly and handicapped families. Various social programs were provided the residents, and the bulk of the programs were carried out by volunteers. The Utah Supreme Court held: "The test of charitable purpose is public benefit or contribution to the common good or the public welfare. It is also necessary that there be an element of gift to the community." Id. at 657. The court concluded that operation of the facility by Episcopal Management Corporation clearly met all of the pertinent criteria applied to determine whether or not a given property was used exclusively for charitable purposes. Id. at 661. The fact that residents received government subsidy payments did not alter the result. The court likened such payments to any other gift or donation except that they came from government. Id. at 660.
Due to the financial constraints on HSS and WM, both facilities, like that in Utah, have had to rely upon volunteer rather than paid employees, in order to deliver some services to their residents. In 1989, volunteers donated over 2,000 hours of assistance to residents of WM alone. Additionally, the facilities had sought volunteer assistance from area Rotary, Lions, and Junior League clubs, in order to obtain hearing aids, glasses, dentures, and wheelchairs for residents. The University of Southern Mississippi School for Nursing had provided health monitoring and screening for residents. It is clear from the record that these facilities could not operate without the donation of the volunteer time of individuals committed to the mission of this ministry to the elderly.
The term "non-profit" does not require the charitable society "to use only red ink in keeping its books and ledgers." Richards v. Iowa Department of Revenue, 414 N.W.2d 344, 352 (Iowa 1987), quoting Milwaukee Protestant Home for the Aged v. City of Milwaukee, 41 Wis.2d 284, 296, 164 N.W.2d 289, 294 (1969). The term "non-profit" means that no profit inures to the benefit of the owners or stockholders because "this would tend to diminish the facilities and services which otherwise would be made available to those unable to pay or to fully pay therefor, and thus would work to the detriment of the benevolent objects of the exemption statutes." City of Natchez v. Natchez Sanatorium Benevolent Association, 191 Miss. 91, 97, 2 So.2d 798, 799 (1941). In the case sub judice, no assets or earnings of HSS or WM have ever inured to the benefit of owners or stockholders, but to the contrary, have always been utilized exclusively for the benefit of the elderly residents.
Both the chancellor and the majority were concerned about the applicable statute § 27-31-1(d) and the intent of the legislature. Subsequent to this proceeding in the lower court, the Mississippi legislature amended § 27-31-1(d), effective July 1, 1992, by adding part (dd) which states:
All property, real or personal, used exclusively for the housing of and provision of services to elderly persons, disabled persons, mentally impaired persons or as a nursing home, which is owned, operated and managed by a not-for-profit corporation, qualified under Section 501(c)(3) of the Internal Revenue Code, whose membership or governing body is appointed or confirmed by a religious society or ecclesiastical body or any congregation thereof.
It can now be said that the intent of the legislature has been made abundantly clear.
At the time the chancellor rendered his decision, § 27-31-1(d) had not been amended. Prior to the majority opinion, the statute was amended to clearly grant the exemption. We should treat the amended portion "as though it had been a part of the original statute." City of Clarksdale v. Miss. Power & Light Co., 556 So.2d 1056, 1057 (Miss. 1990). HSS and WM should derive the benefit of the amended statute and receive the tax exemption requested.
Recently, this Court in Beatty v. State, 627 So.2d 355 (Miss. 1993), allowed Beatty to receive the benefit of a completely new statute rather than an amended one. Beatty, was a case dealing with 16 slot machines, seized by *452 authorities in Lowndes County pursuant to Miss. Code Ann. § 97-33-7 (1972 & Supp. 1992). Beatty failed to raise the issue the majority reversed upon, nor did the record support the allegations that the slot machines in question were more than 25 years of age, qualifying as antiques. Under the new statute § 27-27-12 (Supp. 1992), slot machines over 25 years of age and not used for gambling could be classified as antiques and accordingly not subject to seizure by law enforcement. This Court, retroactively applied an entirely new statute enacted six years after the initial civil action was tried in the Lowndes County courts. Beatty, as the owner of the slot machines, was allowed a new hearing to establish both the age of the machines as well as prove that they were not used for unlawful gambling activities. This was done in accordance with § 27-27-12, since, according to the Beatty majority, the purpose of the statute was "to protect and preserve the slot machine's place in this state's history." Beatty, 627 So.2d at 358. A concurring opinion, by Justice McRae, joined by Justice Smith, pointed out the fallacy of the entire opinion; nevertheless, the majority in Beatty prevailed. If this Court can supply relief to Beatty, granting him a new hearing, thus breathing new life into 16 "one armed bandits" due to the retroactive application of a completely new section of the Mississippi code adopted by legislature six years after trial, surely this Court could and should apply an amended code section, enacted only 2 years after trial, authorizing a tax exemption to the United Methodist Church of Mississippi and its charitable HSS and WM facilities for the elderly. I would reverse and render judgment in favor of HSS and WM.
I respectfully dissent.
JAMES L. ROBERTS, Jr., J., joins this opinion.
McRAE, J., joins in part.
NOTES
[1] For that reason, the chancellor ruled at trial that information regarding the services provided through the Outreach Program was irrelevant.
[2] According to the President of UMSSM, any derivation of net income by the Hattiesburg facilities was passive in nature and was reinvested into the operations of the facilities. It is undisputed by the parties that those facilities do not realize any profits in the sense that they accrue to the benefit of any equity-holding individuals.
[3] The clear implication of this payback policy is that the residents of HSS and WM will collectively pay back these "transfers" through the rents they pay in the future, since their rents are the only significant continuing source of non-debt revenue for the Hattiesburg facilities.
[4] WM did not open until October, 1988.
[5] Since the inception of this litigation the legislature has provided that properties such as the properties here in question shall be exempt. Miss. Code Ann. 1972 § 27-31-1(dd) (Supp. 1992). The act amending the statute provided specifically that the legislation was not intended to affect any assessment previously made. Chapter 418, Laws of 1992. The dissent ignores this essential distinguishing fact in its one and one-half page comparison of this case to our decision in Beatty v. State, 627 So.2d 355 (Miss. 1993). In Beatty we noted our precedents which dictate giving effect to statutes modified while a case or cases are still in the "bosom of the this Court" absent a legislative direction to the contrary. 627 So.2d at 358. The legislative enactment there involved contained no prohibition against giving the effect of the revised statute to pending cases. On the other hand, to give the statute here in question retroactive effect would be to ignore an express legislative directive to the contrary. If the legislature had wanted to forgive taxes assessed under the statute as it a read before the amendment, it could have said so, or, under our precedents, it could have remained silent. Instead it chose to speak and to say just the opposite.
[6] Section 79-11-401 of our code specifically provides that Section 79-11-33 enumerating the types and usage of property which religious societies are permitted to own applies to religious corporations as well. Miss. Code Ann. § 79-11-401 (Rev. 1989).